IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHELL PETROLEUM INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-2016 |
| | § | |
| UNITED STATES, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT, LEGAL ANALYSIS,
CONCLUSIONS OF LAW, AND ORDER**

**TABLE OF CONTENTS**

<u>**Title**</u>                                                                    <u>**Page**</u>

Agreed Findings of Fact . . . . . . . . . . . . . . . . .   1

Additional Findings of Fact . . . . . . . . . . . . . .  54

Legal Analysis of Controlling Facts . . . . . . . . . .  63

      I.     Transfers to Corporation Controlled
          by Transferor Under Section 351 . . . . . . . .  63

          A.    Purpose and effects of § 351 . . . . . . .  63

          B.    The Formation of and Property
               Transfers to Shell Frontier . . . . . . .  66

      II.  "Property" within the Meaning of § 351 . . . .  70

      III. Sham Transaction Doctrine . . . . . . . . . . .  76

          A.    Legal Principles . . . . . . . . . . . .  76

          B.    Application  . . . . . . . . . . . . . . .  82

      IV.  Reallocation Pursuant to Section 482 . . . . .  94

Conclusions of Law  . . . . . . . . . . . . . . . . . .  97

Order . . . . . . . . . . . . . . . . . . . . . . . . . 100

i

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SHELL PETROLEUM INC.,           §
                                §
        Plaintiff,              §
                                §
v.                              §        CIVIL ACTION NO. H-05-2016
                                §
UNITED STATES,                  §
                                §
        Defendant.              §

**FINDINGS OF FACT, LEGAL ANALYSIS,**
**CONCLUSIONS OF LAW, AND ORDER**

After all parties have rested and closed the evidence, and having heard and considered the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

**Agreed Findings of Fact**

**The parties have mutually agreed to the following findings of fact, which the Court adopts:**

I.   Background

1.   Shell Petroleum Inc. ("Shell Petroleum") is a corporation organized under the laws of the State of Delaware with a principal place of business at One Shell Plaza, 910 Louisiana, Houston, Texas 77002.

2.     During all relevant years, Shell Petroleum was the common parent of an affiliated group of corporations (the "Shell Group" or simply "Shell").  The Shell Group filed consolidated federal income tax returns on a calendar-year basis for all relevant years.

3.     This is an action for the recovery of federal income taxes and related interest assessed against and collected from the Shell Group by the United States.

4.     Shell Petroleum brings this action on behalf of itself and as agent for the other members of the Shell Group.

5.     Shell is an integrated oil company with operations in three main business segments: exploration and production (sometimes referred to herein as "E&P"); refining and marketing; and chemicals.  Such operations take place primarily in the United States, including the outer continental shelf ("OCS").

6.     In the early 1990s, Shell had about $22 billion in net assets.  Its E&P segment had about $15 billion in net assets.

7.     Shell managed its E&P activities through a head office business unit known as Exploration and Production, which in 1995 was incorporated as Shell Exploration and Production, Inc.

8.     During all relevant years, Shell Petroleum was indirectly owned by Shell Transport and Trading Company, p.l.c., and by Royal Dutch Petroleum Company, each a publicly traded company.

9.     Shell Oil Company ("Shell Oil") was a wholly owned subsidiary of Shell Petroleum.

2

10.   Shell Energy Resources Inc. ("Shell Energy Resources"), a wholly owned subsidiary of Shell Oil, was the parent holding company of subsidiaries engaged in exploration and production.

11.   Shell Western E&P Inc. ("Shell Western"), a wholly-owned subsidiary of Shell Energy Resources, was incorporated in 1983 and headquartered in Houston, Texas.  During 1992, Shell Western was in the business of exploring for, developing, producing, and transporting oil and natural gas.

12.   Shell Offshore Inc. ("Shell Offshore"), a wholly-owned subsidiary of Shell Energy Resources, was incorporated in 1981 and headquartered in New Orleans, Louisiana.  During 1992, Shell Offshore was in the business of exploring for, developing, producing, and transporting oil and natural gas in the Gulf of Mexico.

13.   SOI Royalties Inc. ("Shell Royalties"), a wholly-owned subsidiary of Shell Offshore, was incorporated in 1984 and headquartered in Houston, Texas.  During 1992, Shell Royalties was in the business of owning overriding royalty interests in oil and gas leases.

14.   Shell Frontier Oil & Gas Inc. ("Shell Frontier"), a corporation wholly owned by Shell Offshore, Shell Royalties, Shell Western, and unrelated investors, was incorporated on August 6, 1992, and headquartered in Houston, Texas.

3

15.   Shell Frontier Services Inc. ("Shell Frontier Services"), a Delaware corporation owned 80% by Shell Western and 20% by Shell Frontier, was incorporated on August 28, 1992, and was in the business of providing services to Shell Frontier and certain members of the Shell Group.

16.   CalResources LLC was formed by Shell in 1994.  In 1997, Mobil acquired an interest in CalResources LLC, and it changed its name to AERA Energy LLC.

17.   In 1990 and 1992, the Shell Group included each of the entities listed above, except for Shell Transport and Trading Company, p.l.c., Royal Dutch Petroleum Company, Shell Frontier, CalResources LLC, and Shell Exploration and Production, Inc.  In 1992 but not 1990, the Shell Group included Shell Frontier Services.

18.   Shell Frontier was included in the Shell consolidated group for financial reporting purposes for all relevant years.

19.   In December 1992, Shell Western sold 540 shares of Shell Frontier stock to unrelated investors.  If Shell Western's capital losses on the sales are allowable, such losses amounted to $353,601,562 in total and resulted in a $320,046,836 consolidated net capital loss for the Shell Group in 1992, $27,587,591 of which the Shell Group properly carried back to 1990, resulting in an overpayment of taxes for that year in the amount of $18,971,341. In addition, $16,269,141 of the 1992 consolidated net capital loss

would be carried back to the Shell Group's 1989 taxable year, $173,819,620 would be carried back to the Shell Group's 1991 taxable year, and $102,370,484 would be carried forward to one or more taxable years of the Shell Group after 1992.

II.   Compliance with the Procedural Requirements for Obtaining a Refund

20.   On September 16, 1991, the Shell Group timely and properly filed its federal income tax return for the 1990 taxable year with the Internal Revenue Service Center at Austin, Texas. The total tax shown on the return, $638,841,240, had been paid before that date.

21.   On December 17, 2004, the Shell Group timely filed an $18,971,341 refund claim for the 1990 taxable year based on the carryback of the 1992 consolidated net capital loss.

22.   In a letter dated May 17, 2005, the Internal Revenue Service disallowed the Shell Group's refund claim.

23.   On or about June 9, 2005, Shell Petroleum timely filed a complaint in the U.S. District Court for the Southern District of Texas for the refund.

III. Certain Shell Personnel

24.   The following individuals were employed by Shell during 1992:

5

a.   Donald Cannon was the general manager of finance for Shell E&P Planning and Finance in 1990 and 1991.  He was then assigned to special projects until April 1993, when he moved to London to manage the Royal Dutch/Shell pension fund.  In 1996, he became head of investor relations and public affairs for Shell and Royal Dutch/Shell in New York.  After 33 years, Mr. Cannon retired from Shell in 1999.  Prior to 1990, Mr. Cannon had numerous assignments involving Shell financing, including banking, cash management, and financing in the treasury department in New York, the oil and gas accounting at headquarters in Houston, project financing in London, and international financing in Houston and California.  Mr. Cannon also served as treasurer of Shell Oil from 1983 to 1990.  Mr. Cannon has an MBA from New York University in international and corporate finance and a law degree from the University of Houston.

b.   Ralph Coselli became the Chief Tax Counsel for Shell Oil in March 1992.  Prior to joining Shell's tax department in 1976, Mr. Coselli was an attorney in the Office of Chief Counsel, Internal Revenue Service. During his 31-year tenure and prior to his retirement from Shell in 2007, Mr. Coselli held various positions in the Shell tax department, including global tax operations but mostly advising on matters pertaining to the E&P department.  Mr. Coselli has a J.D. from

the University of Houston and an LL.M. in taxation from George Washington University.

c.   Gary Demand was Manager of Business Support for Shell Oil during 1992.  His last position was as a business systems manager for Shell Exploration and Production, Inc.  He retired in 2007.

d.   David Haglund was the Chief Geologist of Shell Oil from 1990 to 1993, when he became the staff planning manager for E&P.  Mr. Haglund was also the Chief Geologist of Shell Western and Shell Frontier Services from 1993 until his retirement in 1999.  After joining Shell in 1968, Mr. Haglund held various positions with Shell, including research geologist, exploration geologist, Manager of Geology for Onshore Division, Manager of New Ventures, and Exploration Manager of Offshore Division.  Mr. Haglund has three degrees in scientific disciplines, including a Ph.D. in geochemistry.

e.   Robert Howard was Shell's vice president of E&P operations from 1991 until retirement in March 1995.  As of 1992, Mr. Howard had worked for Shell for 33 years.  He held various engineering positions from 1959 until 1980, when he became general manager of Shell Western E&P operations.  He served as president and chief executive officer of Shell Offshore from 1985 to 1995, president of Shell Western from 1991 until December 1994, and president of Shell Frontier and

Shell Frontier Services from their formations in 1992 until December 1994.  Mr. Howard holds two degrees in mechanical engineering from Rice University.

f.   Eldred Kennair was a financial specialist for Shell E&P Planning and Finance from 1991 until 1993 and an assistant treasurer of Shell Oil from 1995 until retirement in 2001. During Mr. Kennair's 28 years with Shell, he held various accounting positions in both the E&P business segment and in corporate, including treasury-related assignments.  Mr. Kennair holds a B.S. in accounting from the University of New Orleans.

g.   Jack Little was executive vice president of Shell E&P in 1992.  As of 1992, Mr. Little had worked for Shell for 23 years (and had spent three additional years overseas working for Shell Petroleum's parent company, Royal Dutch/Shell). After starting as an engineer for Shell in 1966, he served in various management positions in economic analysis and E&P research until becoming vice president of corporate planning in 1981.  Mr. Little served as the executive vice president of Shell E&P from 1986 to 1993, Chairman of the Board of Directors of Shell Frontier in 1992, president and chief executive officer of Shell Exploration and Production, Inc. from 1994 until 1998, and president and chief executive officer of Shell Oil from 1998 until retirement in 1999.  Mr.

8

Little has three degrees, including a Ph.D. in petroleum engineering from Texas A&M University.

h.   Frank Richardson was president and chief executive officer of Shell in 1992. By 1992, Mr. Richardson had already worked for Shell for over 35 years (and had spent two additional years overseas working for Shell Petroleum's parent company, Royal Dutch/Shell). Mr. Richardson initially worked for Shell as a production and petrophysical engineer, beginning in 1955. In 1972, Mr. Richardson became engineering manager, and he served in various production manager positions until 1978, when he became vice president of corporate planning.  In 1988, Mr. Richardson became Shell's president and chief executive officer, which positions he occupied until his retirement in July 1993.  Mr. Richardson has a B.S. in geological engineering from the South Dakota School of Mines & Technology.

i.   Robert C. Scheidemann, Jr. held positions in the following Shell entities: Shell Oil from 1980 to 1982 (Onshore Exploration - Texas Gulf Coast), Shell Offshore from 1982 to 1989 (various positions relating to exploration), Shell Western from 1989 to 1991 (Geological Team Lead Alaska), Shell Development Co. from 1991 to 1993 (Research Manager Stratigraphic Prediction); Shell Western from 1993 to 1997 (Staff Geologist Louisiana Exploration); Shell Deepwater

9

Development Inc. from 1997 to 2000 (Senior Staff Geologist, Gulf of Mexico Deepwater Exploration); Shell International Exploration & Production Inc. from 2000 to 2006 (Sr. Staff Geologist Regional Framework Studies for regions including Alaska); and Shell Western from 2006 through the date hereof (Principal Regional Geologist Alaska). Mr. Scheidemann has a B.S. in geology from San Diego State University (1976) and an M.S. in geology from the University of Southern California (1980).

j.    Rod Sidle was Manager of Business Analysis for Shell E&P Planning and Finance during 1991 and 1992.

k.    Robert R. Smith was District Manager of North Alaska for Shell Western from the 1970s until his retirement in early 1993. As of 1992, he had worked for Shell for 37 years. Initially, Mr. Smith worked for Shell's Alaska district performing and supervising surface mapping for Alaska and California. In 1976, he was the sales manager for Shell's participation in a large offshore federal lease sale. As District Manager of North Alaska, Mr. Smith was responsible for lease sales, drilling projects, and managing leases in Alaska. Mr. Smith holds bachelor and masters degrees in geology from the University of Missouri.

l.    Steven Stryker was vice president and general tax counsel of Shell Oil from 1986 until his retirement in 2000. Prior to

10

joining Shell in 1978, he was a tax accountant with Arthur Young and a federal tax manager for several corporations. Mr. Stryker started employment with Shell as a general tax manager for several corporations. Mr. Stryker started employment with Shell as a general tax attorney, became assistant general tax counsel in 1981, and then associate general tax counsel in 1985. Mr. Stryker holds a B.S. in sociology and a J.D. from the University of Iowa. He is a licensed attorney and was a licensed C.P.A.

IV.   <u>Shell's Business Problems of the Early 1990s</u>

25. In 1991 and 1992, Shell was in the midst of serious financial problems throughout its entire business.

26. During the mid-1980s and following the Gulf War in 1990-91, oil prices had experienced substantial declines.

27. By 1991, Shell experienced serious declines in net income and net cash flow, debt was approaching its authorized limits, and certain operations were not throwing off enough cash to meet anticipated billions in future cash requirements.

28. For 1991, Shell's consolidated net income was approximately $20 million (Shell's lowest net income in nearly 50 years), compared to net income of approximately $1.04 billion in 1990.

29.  Shell's $20 million of net income in 1991 represented less than a .1% return on Shell's approximately $22 billion in assets.

30.  This result was unacceptable to Shell's management because Shell's parent companies expected a 10%-12% return on net investment.

31.  In the early 1990s, certain exploration programs within Shell Oil were cut back, put on hold, or put into a suspended form.

32.  For the year 1992, Shell's exploration costs were $325 million (an $85 million decrease from $410 million a year earlier).

33.  In July 1992, Moody's Investors Service, Inc. ("Moody's") put Shell on "credit watch" for potential downgrades.

34.  Subsequently in November 1992, Moody's downgraded Shell's debt rating by two grades, from Aaa to Aa2.

V.   Shell's Responses

35.  To address its financial issues in the early 1990s, Shell completed the following significant restructuring transactions:

a.  Shell cut its workforce by over 30%, from about 32,000 employees in 1990 to about 22,000 employees in 1993;

b.  In November 1991, Shell sold most of the Wilmington refinery complex, a major refinery complex in southern California, for $240 million;

12

c.   In November 1992, Shell sold its mining business for 25% of the stock of Zeigler Coal Company and $475 million in cash;

d.   In July 1992, Shell entered into a sale/leaseback of its Woodcreek office complex, which raised approximately $90 million;

e.   In November 1992, Shell sold its credit card business to First Data Resources, Inc. for approximately $13 million.

f.   In the second half of 1992, Shell transferred E&P assets to a newly formed corporation (Shell Frontier), and Shell Western and Shell Frontier raised $164 million in cash by selling Shell Frontier preferred stock to unrelated investors;

g.   In December 1992 and January 1993, Shell raised $176 million in cash from pre-production sales of crude oil from the Auger prospect in the Gulf of Mexico;

h.   In 1993, a strategic partnership alliance was formed with PEMEX, the Mexican national oil company, involving the Deer Park refinery, Shell's largest refinery in the Houston, Texas area, generating almost a billion dollars for capital improvements and providing a firm supply of crude oil for the refinery.

36.  Shell Oil's tax department participated in each of the significant restructuring transactions implemented by Shell Oil in the early 1990s, identified above in paragraph 35(a)-(h).

13

37.   Other than the formation of Shell Frontier, each of the significant restructuring transactions implemented by Shell Oil in the early 1990s identified above in paragraph 35(a)-(h) originated outside of Shell Oil's tax department.

VI.   Shell's Frontier Properties

38.   The term "frontier property" is commonly used by Shell to describe an asset that is not currently commercially competitive, but which has the potential to become commercially competitive if technological, political, economic, or other factors change. Examples of Shell's frontier properties are OCS exploratory leases in remote and/or harsh environments, such as the extreme deepwater Gulf of Mexico and offshore Alaska, as well as oil shale.

A.   Shell Western's Frontier Properties

39.   In the 1980s, Shell had invested hundreds of millions of dollars in frontier properties.

40.   In 1991 and 1992, Shell Western owned most of the Shell Group's frontier properties.

41.   In 1991-92, Shell Western's frontier properties included OCS and onshore properties in Alaska and California, oil shale properties in Colorado, and properties suffering declining production that were in need of enhanced production techniques in order to become commercially competitive.

14

i.   Benefits and Burdens of OCS Leases

42.   The OCS leases purchased from the United States and contributed to Shell Frontier granted the lessee the exclusive right to explore, develop, and produce hydrocarbons from specified areas in the OCS.

43.   The United States receives a bonus payment when it awards an OCS lease.  It also receives an annual rental payment (sometimes referred to as a "delay rental") for a lease that is not in commercial production.  With respect to a lease that is in commercial production, the lessee must pay to the United States the greater of (i) the annual rental payment, or (ii) royalties computed as a percentage of the value of production minus certain allowable costs.

44.   OCS leases are real property interests that are sold by the Minerals Management Service (the "MMS") at public auction.

45.   In general, the initial term of an OCS lease is 5, 8 or 10 years.

46.   However, an OCS lease does not necessarily terminate on the expiration of its initial term.

47.   Beyond the initial term, an OCS lease remains in effect for as long as the operator is producing hydrocarbons from the lease in paying quantities.

48.   Even if the operator is not producing hydrocarbons from an OCS lease in paying quantities, the MMS can under certain

15

circumstances grant an extension of the lease beyond its initial term.

49.   Mineral exploration is a risky business.  Less than 5% of the OCS leases sold by the MMS have been produced, and less than 10% of the OCS leases sold by the MMS have been explored.  In order to acquire an OCS lease offered by the United States, a bidder must assume the risk that it may not find any producible hydrocarbons in the lease tract.

50.   After purchasing an OCS lease, the lessee has the right to decide, subject to the terms of the lease, whether and when it will explore the lease and, if a discovery is made, the right to decide whether and when it will develop and/or produce the lease.

51.   Information gained from drilling on an adjacent lease could impact the value of the lessee's tract by reducing the uncertainties concerning the presence or absence of developable quantities of oil or natural gas.

### ii.   Shell Western's Alaska Frontier Properties

52.   Shell Western's Alaska properties included OCS leases in the Chukchi, Beaufort, and Bering Seas and an onshore property in the North Slope.

53.   The Chukchi Sea is located between Alaska and Russia, north of the Bering Strait.

16

54.  Geologic conditions in the Chukchi OCS appeared favorable for hydrocarbon production because of the Chukchi OCS's relative proximity to, and geological similarities with, the Alaskan North Slope.  The North Slope is home to two of the largest producing oil fields in North America, Prudhoe Bay and Kuparuk River.  Many of the geological features in the oil-producing region in the North Slope extend into the Chukchi OCS.  Reservoirs that are present in Prudhoe Bay or the Kuparuk River field have analogs in the Chukchi Sea.  It was hoped that the rock formations producing the billion-barrel fields in the North Slope, which extend into the Chukchi, indicate the potential for large fields in the Chukchi.

55. The combination of the history of production in stratigraphic areas that extend into the Chukchi Sea with multiple trapping configurations gives hundreds of prospects with rocks that have analogs to productive areas on the North Slope and in other areas of the world.

56.  On March 16, 1988, the MMS held a bid auction for the sale of federal oil and gas leases located offshore Alaska in the Beaufort Sea and in the eastern Chukchi Sea.  The auction was identified as "OCS Lease Offering--Sale 97 Beaufort Sea." 218 leases were awarded for total bonus payments of approximately $120 million.  The bids of the various auction participants are shown in the bidding summary identified as Joint Exhibit 1.

17

57.   The Iron Thunder prospect (consisting of 5 leases in the eastern Chukchi Sea) was acquired in Sale 97 by Shell and partners for a total bonus payment of $838,000.   Shell's share of the bonus payment was $605,900.

58.   On May 25, 1988, the MMS held a bid auction for the sale of federal oil and gas leases located offshore Alaska in the Chukchi Sea.   The auction was identified as "OCS Lease Offering-Sale 109 Chukchi Sea."   351 leases were awarded for total bonus payments of $478,177,948.   Shell Western (in some cases in partnership with Conoco and Elf Aquitaine) was awarded 165 leases on 16 prospects (936,560 acres) for total bonus payments of $390,629,090, representing 81.7% of the total amount of the bonus payments collected from Sale 109.   Shell's initial share of the total bonus payments in 1988 was $271,048,769.

59.   At Chukchi Sea Sale 109, Shell and its partners paid an average of $417 per acre for certain properties, and other companies paid $84 per acre for other parties.   The average bid for the leases that were auctioned off at Sale 109 was $241 per acre. The bids of the various auction participants are shown in the bidding summary identified as Joint Exhibit 2.

60.   The initial term of Shell Western's Chukchi Sea Sale 109 leases was ten years.

18

61.  Chukchi Sea Sale 109 leases generally required annual rental payments to the MMS on June 30 of each year for any lease held on that date.

62.  Except for the Iron Thunder leases, all of the Chukchi Sea leases transferred by Shell Western to Shell Frontier were acquired at Sale 109.

63.  Between 1989 and 1991, Shell drilled four wells in the Chukchi Sea at a total cost of about $175 million: one well on each of Shell's Burger, Crackerjack, Klondike, and Popcorn prospects. Chevron drilled one Chukchi Sea well at a cost of $30 million: Diamond.  The Diamond well was drilled downdip from Shell Western's Iron Thunder prospect.

64.  Shell's exploratory drilling discovered pooled petroleum at Burger, Klondike, Popcorn, and possibly Crackerjack.  With the possible exception of the Burger discovery, the lateral extent of the pools and their reservoir characteristics were not fully determined.

65.  The Chukchi Sea was a difficult environment for exploration activities because of various factors, such as the weather, sea state, and limited operating windows for drilling.

66.  As of 1992, there was no existing infrastructure to transport significant quantities of oil and gas from a Chukchi Sea lease to an onshore collection point.

67.  In 1989, Shell was approached by Amoco and Exxon and subsequently sold to them 20% of its working interest in the Chukchi acreage acquired in Lease Sale 109 (19% to Amoco and 1% to Exxon).  In June and July of 1992, Murphy Oil expressed an interest in acquiring a 10% interest in Shell Western's leases at its Klondike and Burger Prospects in the Chukchi Sea, although the sale ultimately did not occur.  Moreover, in September 1992, companies unrelated to Shell (including Mobil, Exxon, Amoco, Marathon, Petrofina, Elf Aquitaine, Murphy, and Texaco) held full interests in 68 of the unrelinquished Chukchi leases acquired in Lease Sale 109 and partial interests in 61 other leases acquired in Lease Sale 109 that were held by Shell Western (for a total of 129 out of the 176 unrelinquished Chukchi leases acquired in Lease Sale 109).

68.  Shell's partners in Chukchi Sea leases who decided to abandon or surrender their lease interests were required, by contract, to offer their interests to the other partners.

69.  In 1992, over 60% (based on original bonus cost) of Shell Frontier's Chukchi leases acquired in Lease Sale 109 had third-party owners.

70.  51% of the Chukchi Sea leases that had been sold by the United States in 1988 in Lease Sale 109 had not been relinquished as of September 1, 1992, the date on which Shell Western and other members of the Shell Group transferred E&P properties to Shell Frontier solely in exchange for Shell Frontier stock and unrelated

20

investors invested $110 million cash in Shell Frontier auction rate preferred stock.  49% of the Chukchi leases sold in Lease Sale 109 had been relinquished earlier in 1992.

71.  Of the 165 leases acquired in Lease Sale 109 that Shell Western held prior to the transfers to Shell Frontier, Shell Western surrendered 57 to the MMS prior to July 1, 1992.

72.  The Beaufort Sea is the portion of the Arctic Ocean located north of the Alaskan North Slope and Canada's Northwest and Yukon Territories and west of Canada's Arctic Islands.

73.  The Beaufort Sea shares the same stratigraphic framework with the highly productive North Slope.

74.  On December 11, 1979, the United States Department of Interior, Bureau of Land Management ("BLM") held a bid auction for the sale of federal oil and gas leases located in the Beaufort Sea. (Prior to 1982, OCS auctions were conducted by the BLM, not the MMS.).  The auction has been identified as Sale BF.  24 leases were awarded for total bonus payments of $488,691,137.  Shell and non-affiliated partners were awarded 6 leases for a total bonus payment of $72,457,000; Shell's share of the bonus payment was $63,422,300.

75.  The Seal prospect was acquired by Shell (90%) and Murphy Oil (10%) at Sale BF for $60,890,000.  Shell's share of the bonus payment was $54,801,000.

76.  In 1990, Shell's Seal prospect was combined with leases held by Amerada Hess to form the Northstar Project.  Operations

21

were suspended by the MMS from January 24, 1990 through January 23, 1995, and the lease expiration date was extended to April 30, 1998.

77. On August 22, 1984, the MMS held a bid auction for the sale of federal oil and gas leases located offshore Alaska in the Beaufort Sea.  The auction was identified as "OCS Lease Offering--Sale 87 Diapir Field."  162 leases were awarded for total bonus payments of approximately $1 billion.

78. The Hammerhead (also known as "Tsingtao") prospect, consisting of 5 leases, was acquired by Shell Western (33.34%), Amoco (33.33%), and Union Oil of California (33.33%) for $75,526,000 in Sale 87.  Shell's share of the bonus payment was $25,174,299.

79. Shell Western with its partners drilled several wells in the Beaufort Sea between 1982 and 1986.  Two of the wells were drilled on the Hammerhead Prospect.  Four of the wells were drilled on the Seal Prospect and encountered pay in the Sadlerochit sandstone.

80. The charts below summarize the MMS resource assessments for the Chukchi and Beaufort Seas:

| Risked Mean Undiscovered Technically Recoverable Resources | | | | |
|---|---|---|---|---|
| MMS Assessment | Chukchi Sea | | Beaufort Sea | |
| | Oil (Bbbl) | Gas (Tcf) | Oil (Bbbl) | Gas (Tcf) |
| 1987 | 2.22 | 6.33 | 1.27 | 8.26 |
| 1990 | Not assessed | Not assessed | Not assessed | Not assessed |
| 1995 | 13.02 | 51.84 | 8.84 | 43.50 |
| 2000 | 15.46 | 60.11 | 6.94 | 32.07 |
| 2005 | 15.38 | 76.77 | 8.22 | 27.65 |
| Risked Mean Undiscovered Economically Recoverable Resources ($30 per barrel oil price in constant $) | | | | |
| | Oil (Bbbl) | Gas (Tcf) | Oil (Bbbl) | Gas (Tcf) |
| 1987 | 1.03 | 2.52 | 0.38 | 2.38 |
| 1990 | 1.69 | 4.46 | 0.67 | 2.45 |
| 1995 | 2.85 | Not assessed | 3.22 | Not assessed |
| 2000 | 6.11 | Not assessed | 3.24 | 4.20 |
| 2005 | 0 | 0 | 0.47 | 0.59 |

Bbbl = billions of barrels  Tcf - trillions of cubic feet

Technically recoverable resources are oil and gas pools that could be recovered using established technologies, but without regard to profitability. Economically recoverable resources are a portion of the technically recoverable endowment that could be profitable to produce under a given set of economic assumptions. Differences in resource assessment results can be attributed to changes in geologic and engineering data, as well as changes in the models and modeling methodology. However, the differences attributed to each factor are difficult to sort out. Furthermore, resource estimates are best represented by a range of volumes correlated to

probabilities.   The estimates shown in the above charts are only the mean of a wide range in possible resource volumes that could be present in these areas and are undiscovered at the time of the assessment.

The above resource estimates are given in terms of "risked volumes," where the probability of favorable conditions is factored into the calculations.   The technically recoverable estimates (upper table) factor in the probability that geologic conditions are present to create pooled and recoverable hydrocarbons.   The economically recoverable estimates (lower table) factor in both (i) the geologic probability of pooled and recoverable hydrocarbons and (ii) the economic probability that one or more of the pools could be commercially successful under the assumed conditions.

81.   The Bering Sea is the northernmost region of the Pacific Ocean.   Its borders are defined to the north by Alaska, the Bering Strait, and northeastern Siberia, and to the south by the arc of the Alaska Peninsula, Aleutian Islands, and Commander Islands.

82.   On October 11, 1988, the MMS held a bid auction for the sale of federal oil and gas leases located offshore Alaska in the Bering Sea.   The auction was identified as "OCS Lease Offering--Sale 92 N. Aleutian Basin."   23 leases were awarded.

83.   Shell Western, directly and with non-affiliated partners, was awarded 5 leases for total bonus payments of $37,409,000.   The

leases were identified as Monaco (3) and Rio (2).  Shell's share of the total bonus payments in 1988 was $24,521,000.

84.  The Monaco and Rio prospects were located in Bristol Bay, a portion of the North Aleutian Basin OCS Planning Area of the Bering Sea.

85.  In response to concern by environmentalists, Congress in 1989 imposed a moratorium on offshore oil and gas development in the North Aleutian Basin planning area, among others.  In 1990, President Bush withdrew certain areas, including the North Aleutian Basin planning area, from leasing consideration until after 2000.

86.  Leases awarded in North Aleutian Basin Sale 92 would have expired in 2001.

### iii. <u>Shell Western's Offshore California Frontier Properties</u>

87.  Shell Western's offshore California frontier properties included OCS leases associated with the Lion Rock, Purisima Point, Santa Maria, and Point Sal prospects in the offshore Santa Maria Basin.

88.  26 exploration wells have been drilled in the offshore Santa Maria Basin, most between 1982 and 1986.

89.  As of 1992, the leases were being held under Suspensions of Production from the MMS (the Suspensions of Production expired in 1994.

25

90.  Development of Shell Western's offshore California properties depended on an improved regulatory and permitting climate.

### iv.  Shell Western's Onshore California Frontier Properties

91.  Shell Western's onshore California frontier properties included interests in two heavy oil fields near Bakersfield, California: East Cat Canyon and Poso Creek.

92.  The East Cat Canyon field is located in the onshore Santa Maria Basin, Santa Barbara County, California, and consists of about 2,000 acres.

93.  The East Cat Canyon field has been shut in since 1988.

94.  Prior to 1988, approximately 95% of the production from the East Cat Canyon Field was from the Brooks formation, which began production nearly a century ago in 1909.

95.  Steam injection began in the 1960s, and Shell acquired the property in late 1984.

96.  Shell Western had 8 leases in Poso Creek, of which 7 were nonproducing and 1 (Midway-Premier) was producing.  Poso Creek had 30 active wells with an additional 98 wells shut-in.

97.  In 1991, Midway-Premier produced 19 million cubic feet of natural gas (all of which was used for fuel at the unit) and 65,000 barrels of oil.

26

98. The Poso Creek property was under consideration for shut-in in 1992 because of very low prices for heavy oil in California at the time.

99. Poso Creek and East Cat Canyon contained heavy crude oil deposits which would have required thermal oil recovery methods to produce. In the opinion of Shell management, development in 1992 was not appropriate under the then-current economic conditions.

v. <u>Shell Western's Oil Shale Properties</u>

100. Oil shale is sedimentary rock containing a high proportion of solid organic matter (called "kerogen") that can be converted to synthetic oil and gas by thermal processing.

101. Shell Western's frontier properties included 8 oil shale properties located in the Piceance Creek Basin, in the northwest corner of Colorado, known as the Mahogany, Pacific, Red Pinnacle, Berthelson, Greeno, Juhan, Johnson, and Oldland properties:

| Prospect | Gross Acreage | Shell's Net Acreage (owned) | Net Oil Shale Bearing Acres |
|---|---|---|---|
| Mahogany | 19,584 | 17,271 | 16,000 |
| Pacific | 13,347 | 13,307 | 6,800 |
| Red Pinnacle | 4,726 | 4,726 | 1,910 |
| Berthelson | 1,000 | 1,000 | 720 |
| Greeno | 640 | 640 | 600 |
| Juhan | 40 | 0 (Fee in minerals only) | 40 |
| Johnson | 640 | 213 | 213 |
| Oldland | 1,941 | 627 | 640 |
| Total | 41,886* | 37,752* | 26,923 |

102. Shell Western had acquired its Colorado oil shale properties during the period 1985-87, mostly from unrelated parties, for approximately $53 million.

103. Shell Western's Colorado oil shale properties contained hydrocarbon deposits.

104. As of July 1, 1992, Shell Western's oil shale deposits had not been mined, and there were no plans to mine them in the immediate future.

105. Shell has never sold any of the oil it has produced from oil shale.

---------------

*The totals agreed by the parties vary slightly from the Court's calculations: the total Gross Acreage adds up to 41,918, and Shell's Net Acreage (owned) adds up to 37,784.

106. In 1992, the Colorado properties required higher oil and gas prices and/or improvements in oil shale recovery technology to become economically competitive.

107. Oil shale has been produced in several countries continuously since the 1920s. The United States is not one of those countries. In 1992, worldwide production of oil shale was in excess of 30 million metric tons. The peak year for worldwide production was 1981, after which annual production declined to about 15 million metric tons in 1999.

vi. <u>Shell Western's Producing Properties Requiring Enhanced Recovery Techniques</u>

108. Shell Western's frontier properties also included producing oil and gas properties that were in the secondary production phase but were experiencing declining production.

109. One such property was Shell Western's nearly 52% working interest in the Bennett Ranch unit, a mature waterflood field of 7,050 acres located near Denver City in West Texas.

110. Shell Western was the operator of the Bennett Ranch unit.

111. Oil production at Bennett Ranch had peaked at 12,100 barrels of oil per day around 1974 and, by 1992, had declined to about 4,500 barrels of oil per day.

112. As of July 1, 1992, Bennett Ranch had 388 active wells.

113. Crude oil from Bennett Ranch was sold to Shell Oil under a Crude Oil Purchase Agreement.

114. Shell acquired its interest in Bennett Ranch, including equipment, between 1985 and 1989 with an original cost of approximately $232 million.

VII. <u>The Decision to Form Shell Frontier</u>

115. Frank Richardson has stated that certain of Shell's frontier properties were "certainly not producing" and "would require leading edge technology, logistics or price to capitalize on them."

116. By 1992, most of Shell Western's frontier assets had declined in value.

117. In the early 1960s, Shell abandoned its interests in Prudhoe Bay.

118. By 1980, Prudhoe Bay had become one of the most prolific producing fields in North America, and it was for many years the largest producing field in the United States.

119. In 1992, Shell Oil's tax department (at times referred to internally as the "tax firm") had approximately 50 tax attorneys, some of whom ultimately reported to Ralph Coselli.  Mr. Coselli reported to Steven Stryker, Vice President and General Tax Counsel of Shell Oil.

120. The idea of selling preferred stock in a newly formed E&P company to raise cash was proposed to Frank Richardson in early 1992 by Steven Stryker.

30

121. In January 1992, after initial contacts were made by Steven Stryker, Ralph Coselli discussed with the Bank of Montreal the Shell proposal to raise cash by selling preferred stock in a newly formed E&P company.

122. The discussions with the Bank of Montreal concerned the issuance of fixed-rate preferred stock, as opposed to auction rate preferred stock.  In general, "auction rate preferred stock" is preferred stock, the dividend rate on which is adjusted periodically by means of auctions in which shares of the stock are bought and sold.

123. Shell decided not to use the services of the Bank of Montreal because the range of dividend rates on the proposed fixed-rate preferred stock (7-8%) was too high.

124. Ralph Coselli and Joe Henderson (a Shell tax attorney) and Jim Wells (assistant treasurer of Shell Oil) met with Goldman Sachs with the objective of obtaining a lower preferred stock dividend rate than that proposed by the Bank of Montreal.

125. Goldman Sachs introduced Shell to the concept of Dutch auction rate preferred stock, which brought the expected dividend rate down from the 7-8% that the Bank of Montreal was proposing to 2-3%.

126. Prior to the formation of Shell Frontier, Mr. Stryker knew (as any knowledgeable tax lawyer would have) that, under sections 351(a), 358(a)(1), and 362(a)(1) of the Internal Revenue

Code, there would be the potential for Shell Western to have a loss from the sale of Shell Frontier auction rate preferred stock and for Shell Frontier to have income, gain, deduction, or loss with respect to the assets received by Shell Frontier from Shell Western.

## VIII. The Formation of Shell Frontier

127. On August 6, 1992, Shell Frontier was incorporated under the laws of Delaware.  Shell Frontier was authorized to issue 3,000 shares of common stock and 7,000 shares of preferred stock.

128. Pursuant to a Private Placement Memorandum dated August 25, 1992 (the "PPM"), Shell Frontier offered 1,100 out of the 2,000 authorized shares of voting auction rate preferred stock to third parties that were potential investors.  The PPM contained descriptions of the properties to be transferred to Shell Frontier, the business to be conducted by Shell Frontier, and other matters of interest to potential investors.

129. Placement Agents for the offering were Goldman, Sachs & Co. and Lehman Brothers, pursuant to a Placement Agency Agreement and Term Selection Agent Agreement.

130. Donald Cannon was the initial Chairman of the Board of Directors and President of Shell Frontier.

131. One of the goals of the formation of Shell Frontier was to raise cash without increasing debt of Shell Oil.

32

132. On September 1, 1992, Shell Western transferred frontier properties to Shell Frontier, and Shell Western received from Shell Frontier 900 of the 2,000 shares of Shell Frontier auction rate preferred stock.  Each share had a $100,000 liquidation preference per share, for a total of $90 million.  Shell Western received 225 shares of each of Series A, B, C, and D of Shell Frontier auction rate preferred stock.

133. On September 1, 1992, Shell Offshore transferred its working interests in leases with respect to three producing offshore oil and natural gas fields and related production equipment in the Gulf of Mexico to Shell Frontier in exchange for 2,200 shares of Shell Frontier common stock and 765 shares of Shell Frontier nonvoting preferred stock.

134. On September 1, 1992, Shell Royalties transferred overriding royalty interests in leases with respect to twelve oil and natural gas fields in the Gulf of Mexico to Shell Frontier in exchange for 50 shares of Shell Frontier common stock and 2,885 shares of Shell Frontier nonvoting preferred stock.

135. On September 1, 1992, investors unrelated to the Shell Group purchased 1,100 shares of Shell Frontier auction rate preferred stock by transferring $110 million to Shell Frontier.

136. Immediately after the issuance of Shell Frontier stock to Shell Western, Shell Offshore, Shell Royalties, and the unrelated

33

investors, the number of shares and voting power of Shell Frontier stock were shared as follows:

| Stock | Entity | # of Shares | % of Vote |
|-------|--------|-------------|-----------|
| Common-voting | Shell Offshore | 2,200 | 51.7% |
| Common-voting | Shell Royalties | 50 | 1.2% |
| | | | |
| APS-voting | Shell Western | 900 | 21.2% |
| APS-voting | Investors | 1,100 | 25.9% |
| Total Voting Shares | | 4,250 | 100.0% |
| | | | |
| Non-voting Preferred | Shell Offshore | 765 | |
| Non-voting Preferred | Shell Royalties | 2,885 | |
| Total non-voting shares | | 3,650 | |
| | | | |
| Total all shares | | 7,900 | |

137. External debt was generally in the name of Shell Oil. Individual subsidiaries did not generally borrow funds outside the Shell organization.

138. No member of the Shell Group had any nonaffiliated shareholders in 1992 (other than Shell Petroleum, whose parent companies were not members of the Shell Group).

IX. Description of the Shell Frontier Stock

A.    In General

139. Upon a liquidation of Shell Frontier, after the payment of creditors, proceeds of liquidation were to be distributed in the following priority: first to holders of auction rate preferred stock to the extent of its liquidation preference ($100,000 per share), second to holders of nonvoting preferred stock to the extent of the liquidation preference ($100,000 per share), and

34

third to holders of common stock.  More complete descriptions of the terms of the three classes of Shell Frontier stock (common, nonvoting preferred, and auction rate preferred) can be found in Joint Exhibits 3-8.

140. As a result of the unrelated investors' acquisition of 1,100 shares of Shell Frontier auction rate preferred stock, the unrelated investors held stock possessing approximately 25.88% of the voting power of all outstanding Shell Frontier stock (1,100 shares of auction rate preferred stock divided by 4,250 total outstanding shares of voting stock).

141. The unrelated investors' acquisition of stock possessing over 20% of the voting power of all outstanding Shell Frontier stock resulted in Shell Frontier not being a member of the Shell Group for federal income tax purposes; consequently, Shell Frontier was required to file a federal income tax return separate from the consolidated federal income tax return filed by the Shell Group.

B.    The Auction Rate Preferred Stock

142. There were four series of Shell Frontier auction rate preferred stock: Series A, Series B, Series C, and Series D.  Each series consisted of 500 shares.

143. At the time of issuance, the initial dividend rates for the Series A, Series B, Series C, and Series D shares of Shell

35

Frontier auction rate preferred stock were respectively set to 2.6%, 2.65%, 2.7%, and 2.8%.

144. The dividend rate for shares of each series of auction rate preferred stock was reset periodically (generally every 49 days) in connection with auctions in which shares of such series were bought and sold.

145. Dividends on each series of auction rate preferred stock were generally payable every 49 days.

146. No dividend payment due on Shell Frontier auction rate preferred stock has ever been missed.

147. Dividends on the auction rate preferred stock were cumulative.

148. Dividends could be paid on the auction rate preferred stock only out of funds legally available therefor.

149. There was no arrangement guaranteeing the payment of dividends.

150. A holder of auction rate preferred stock could not compel Shell Frontier to redeem the stock.

151. Shell Frontier did not guarantee or otherwise arrange to ensure that a holder of auction rate preferred stock could sell its stock in an auction.

152. In bankruptcy, the claims of the holders of Shell Frontier auction rate preferred stock would have been subordinate to the claims of Shell Frontier's creditors.

36

153. The holders of the Shell Frontier auction rate preferred stock had no right to receive a sum certain either on demand or on a specified date.

154. The Shell Frontier auction rate preferred stock would not participate in the growth of Shell Frontier, except to the extent that the growth of Shell Frontier resulted in additional assets being available to pay dividends with respect to the auction rate preferred stock or (in the case of a redemption of the stock) the liquidation preference of the auction rate preferred stock.

X.   Description of the Assets Transferred to Shell Frontier

155. The properties transferred by Shell Western to Shell Frontier consisted of: (i) Shell Western's California offshore Santa Maria Basin leases associated with the Lion Rock, Purisima Point, Santa Maria, and Point Sal prospects, (ii) its leases and fee interests associated with the East Cat Canyon and Poso Creek properties in onshore California, (iii) fee and leasehold interests with respect to Colorado oil shale properties, (iv) fee and leasehold interests with respect to the Bennett Ranch unit in West Texas, (v) certain exploratory OCS mineral leases in Alaska, (vi) the Itkillik leases in onshore Alaska on the North Slope, and (vii) related assets (such as equipment).

156. The Alaska exploratory OCS mineral leases transferred by Shell Western to Shell Frontier were: (i) Chukchi Sea leases

associated with the Bagel, Bearclaw, Blizzard, Burger, Crackerjack, Iron Thunder, Klondike, Kolache, Nacho Supreme, and Taco prospects, (ii) Beaufort Sea leases associated with the Seal and Hammerhead prospects, and (iii) Bering Sea leases associated with the Monaco and Rio prospects.

157. The Alaska leases that Shell Western transferred to Shell Frontier gave the holder exclusive rights to explore, develop, and produce on 590,127 net acres in Alaska, as follows:

| Prospect | Net Acres |
|---|---|
| Bagel | 22,772 |
| Bearclaw | 9,109 |
| Blizzard | 29,414 |
| Burger | 124,000 |
| Crackerjack | 144,600 |
| Hammerhead (aka Tsingtao) | 9,490 |
| Iron Thunder | 23,911 |
| Itkillik | 43,981 |
| Klondike | 51,237 |
| Kolache | 18,445 |
| Monaco | 13,093 |
| Nacho Supreme | 38,425 |
| Rio | 5,694 |
| Seal | 4,719 |
| Taco | 51,237 |
| Total | 590,127 |

158. The properties transferred by Shell Western to Shell Frontier had an aggregate tax basis of $679,335,936, as follows:

38

| Property | Basis (in $ millions) |
|----------|----------------------|
| Bennett Ranch | $ 157.4 |
| Colorado properties | $  35.4 |
| California-onshore | $  50.7 |
| California-offshore | $ 145.7 |
| Alaska-offshore | $ 285.2 |
| Alaska-onshore | $   .4 |
| Miscellaneous items | $   4.4 |

(Due to rounding, the sum of the foregoing figures does not exactly equal $679,335,936.)

159. At the time Shell Western transferred properties to Shell Frontier, there was no plan immediately to develop the exploratory properties transferred by Shell Western to Shell Frontier.

160. Shell Western did not transfer all of the frontier properties it owned to Shell Frontier.

161. Shell Western transferred all of its Alaska frontier properties to Shell Frontier, except for properties that had already been marked for surrender.

162. Of Shell Western's 8 Chukchi Sea leases acquired in Lease Sale 109 that were not transferred to Shell Frontier, 2 were surrendered by Shell Western to the MMS in October 1992, and 6 were surrendered by Shell Western to the MMS in May 1993.

163. The properties transferred by Shell Offshore to Shell Frontier produced 4,758,000 barrels of oil and 13,121 million cubic feet of natural gas in 1991, which represented approximately .91% and .44% of Shell Offshore's proved reserves of crude oil and natural gas, respectively.

164. As of July 1, 1992, the properties transferred by Shell Offshore to Shell Frontier were estimated to have reserves of 42,645,000 barrels of crude oil and 114,761 million cubic feet of natural gas.

165. Shell Oil's book accounting for the transfers of properties from Shell Offshore, Shell Royalties, and Shell Western to Shell Frontier on September 1, 1992, is described in a memorandum dated December 31, 1992, identified as United States's Exhibit 95.

XI.  <u>American Appraisal Associates's Appraisal of the Assets Transferred to Shell Frontier</u>

166. In 1992, in connection with the transfer of properties by Shell Western, Shell Offshore, and Shell Royalties to Shell Frontier, Shell asked American Appraisal Associates ("AAA") to appraise the properties to be transferred.  AAA was paid approximately $70,000 plus expenses for its services.

167. In the spring of 1992, AAA was initially contacted by Ralph Coselli to discuss the valuation assignment.

168. On August 31, 1992, AAA issued a report (the "AAA Report") containing an appraisal, as of July 1, 1992, of the properties transferred by Shell Offshore, Shell Royalties, and Shell Western to Shell Frontier.  Copies of the AAA Report and Exhibit A thereto are identified as Joint Exhibits 9 and 10.

40

169. The AAA Report based its valuation of the producing properties, the California exploratory leases, and the Alaska exploratory leases transferred by Shell Western to Shell Frontier at least in part on the discounted net cash flow method.

170. The AAA Report stated the following fair market values, as of July 1, 1992, for specific assets or groups of assets transferred by Shell Western to Shell Frontier (in $000):

|  | Land | Equipment | Mineral Interests | Totals |
|---|---|---|---|---|
| Bennett Ranch | $0 | $46,000 | $21,051 | $67,051 |
| East Cat Canyon | 1,500 | 600 | 8,704 | 10,804 |
| Poso Creek | 25 | 975 |  | 1,000 |
| Colorado Oil Shale | 11,630 |  | 0 | 11,630 |
| Alaska leases |  |  | 0 | 0 |
| California OCS leases |  |  | 0 | 0 |
|  | $13,155 | $47,575 | $29,755 | $90,485 |

171. The AAA Report did not include in its discounted cash flow analysis any consideration of delay rental payments with respect to the properties transferred from Shell Western to Shell Frontier.

172. Rod Sidle, Manager of Business Analysis for Shell's E&P Planning and Finance operations in 1992, reviewed portions of the AAA Report for the sole purpose of determining whether the information used by AAA accurately reflected the information that

Shell had provided regarding the producing properties transferred to Shell Frontier.   Mr. Sidle has stated in a deposition that, based on his review of portions of the AAA Report, he concluded that AAA had correctly understood in preparing its report the information that Mr. Sidle had provided to AAA.

173. A copy of a draft of the AAA Report and a copy of the final AAA Report were sent to Ralph Coselli.

174. Shell used the AAA Report's aggregate valuations of the groups of properties transferred by Shell Western, Shell Offshore, and Shell Royalties for purposes of determining the amount of Shell Frontier stock to be received by each of Shell Western, Shell Offshore, and Shell Royalties.

175. AAA was the only appraisal company that Shell engaged to appraise the assets transferred to Shell Frontier in September 1992 in connection with such transfer.

176. A property may still contain economically recoverable oil even though a company has not recorded any reserves with respect to that property.

177. The MMS generally uses probabilistic methods to determine the adequacy of bids received with respect to exploratory properties because probabilistic methods better account for uncertainties related to such properties than do deterministic methods.

42

178. Identified as Plaintiff's Exhibit 287 is a December 10, 2001, memorandum concerning the AAA Report that was written by Richard Pane, an IRS economist, to Karen DeRose, then Team Manager for the IRS's audit of Shell, and certain attached pages that are referred to in the memorandum and contain handwritten notes by Richard Pane.

XII.  <u>Shell Western's Sales of Shell Frontier Stock</u>

179. On December 2, 1992, in an arm's length transaction, Shell Western sold 180 shares of its Series A Shell Frontier auction rate preferred stock to unrelated parties for $18,000,000.

180. On December 9, 1992, in an arm's length transaction, Shell Western sold 180 shares of its Series B Shell Frontier auction rate preferred stock to unrelated parties for $18,000,000.

181. On December 16, 1992, in an arm's length transaction, Shell Western sold 180 shares of its Series C Shell Frontier auction rate preferred stock to unrelated parties for $18,000,000.

182. Prior to the formation of Shell Frontier and the issuance of Shell Frontier auction rate preferred stock to Shell Western, Shell Oil's management had decided that Shell Western would sell most of its 900 shares of Shell Frontier auction rate preferred stock in late December 1992 and/or January 1993.

183. One reason that Shell Western received shares of auction rate preferred stock from Shell Frontier was so that it could sell a portion of those shares and raise cash.

184. Reuben Johnson, Lehman Brothers's representative in a Rule 30(b)(6) deposition, has stated that he thought that the market could have absorbed all 900 shares of Shell Frontier auction rate preferred stock held by Shell Western during the initial auctions for such stock in December 1992 and January 1993.

185. Robert Howard has stated that Shell Western's 1992 sale of Shell Frontier auction rate preferred stock was a monetization that was based primarily, if not exclusively, on the income-producing properties that were transferred to Shell Frontier.

186. For book accounting purposes, Shell Western recorded the sale of 540 shares of Shell Frontier auction rate preferred stock during December 1992 as a $54 million increase to the cash account and a $54 million reduction to the investment in subsidiaries account, with no gain or loss recorded.

187. Shell Western sold its remaining 360 shares of Shell Frontier auction rate preferred stock in 1998 for $36 million in cash.

188. For book accounting purposes, Shell Western recorded the 1998 sales by increasing cash in the amount of $36 million and reducing the investment in subsidiaries account in the amount of $36 million, with no gain or loss recorded.

44

XIII.  <u>The Operation of Shell Frontier</u>

189. Shell Frontier assumed ownership of the assets it acquired in September 1992.

190. For the years 1992 through 2002, Shell Frontier reported a total of over $1 billion of taxable income on its federal tax returns and paid a total of over $349 million in federal income taxes, as set forth below:

| Year | Taxable Income | Tax Paid with Returns |
|------|----------------|------------------------|
| 1992 | $65,567,636 | $22,370,300 |
| 1993 | 118,412,927 | 41,486,847 |
| 1994 | 60,241,688 | 21,155,026 |
| 1995 | 2,123,099 | 5,173,517 |
| 1996 | 245,909,819 | 80,787,661 |
| 1997 | 112,260,535 | 39,253,794 |
| 1998 | (84,084,532) | (29,429,586) |
| 1999 | 117,178,966 | 41,012,638 |
| 2000 | 181,726,987 | 63,604,445 |
| 2001 | 113,258,300 | 39,640,405 |
| 2002 | 69,406,335 | 24,292,217 |
| Total | $1,002,001,760 | $349,347,264 |

No part of this taxable income was attributable to the contemporaneous production of hydrocarbons from the Alaska OCS leases, California OCS leases, or Colorado oil shale properties transferred by Shell Western to Shell Frontier on September 1, 1992.

191. Shell Frontier paid the following amounts as dividends on its auction rate preferred stock from 1992 through 2002:

45

| Year | Dividends |
|------|-----------|
| 1992 | $1,587,985 |
| 1993 | 5,550,270 |
| 1994 | 6,200,810 |
| 1995 | 9,628,275 |
| 1996 | 7,596,660 |
| 1997 | 7,685,355 |
| 1998 | 8,884,191 |
| 1999 | 8,526,208 |
| 2000 | 9,109,846 |
| 2001 | 6,432,975 |
| 2002 | 3,673,860 |
| Total | $74,876,435 |

192. The properties transferred by Shell Offshore and Shell Royalties, as well as the Bennett Ranch, Poso Creek, East Cat Canyon, Monaco, and Rio, Seal, and offshore Santa Maria Basin properties transferred by Shell Western to Shell Frontier on September 1, 1992, generated cash.  The cash generated from the East Cat Canyon, Monaco, and Rio, Seal, and offshore Santa Maria Basin properties was generated by Shell Frontier's disposition of them, not from their operation by Shell Frontier.

193. Shell Frontier entered into agreements with Shell entities regarding its management and operations, including:

a.   Services Agreement with Shell Oil to provide administrative and staff services at cost;

b.   Services Agreement with Shell Offshore to provide administrative and staff services at cost; and

c.   Services Agreement with Shell Western to provide administrative and staff services at cost.

46

194. Shell subsidiaries generally entered into a revolving credit and cash management agreement with Shell Oil, allowing for centralized management of cash and borrowing of funds.

195. Shell Frontier entered into a Revolving Credit and Cash Management Agreement with Shell Oil dated September 1, 1992, which provided Shell Frontier with a line of credit up to $150 million.

196. Each subsidiary within the Shell E&P structure had its own capital budget, subject to its respective board's approval. The Shell Oil board approved the capital budgets of each business unit (such as E&P), which typically included a contingency-type fund for flexibility and for possible allocation among the unit's subsidiaries during the fiscal year.

197. From 1992-1994, Shell Western or Shell Frontier (and its partners) paid a total of $3,400,688 in delay rentals with respect to the Chukchi Sea properties acquired in Lease Sale 109.  During the same time period, $2,017,545 in delay rentals was paid with respect to Chukchi Sea properties acquired in Lease Sale 109 in which Shell Western and Shell Frontier did not own an interest.

198. Shell's and Shell Frontier's processes for deciding whether to retain or surrender oil and gas properties were the same.

199. Exploration lease would be reviewed periodically to determine whether they should be retained or surrendered.

200. A C-2 form was a document recording the shorthand reason for reclassifying the status of a lease from active delay rental payments to nonpayment of delay rentals.  C-2 status was sometimes a precursor to surrendering a lease.

201. In 1995, the MMS dropped a royalty suit against Shell Offshore in exchange for (i) Shell Frontier's dropping its Rio/Monaco drilling ban lawsuit against the MMS and (ii) the surrender of the Rio and Monaco leases and certain leases in North Carolina and Florida.

202. To facilitate the settlement, in November 1994, Shell Offshore purchased the Monaco and Rio leases from Shell Frontier for $32,503,540, resulting in a $7,982,190 capital gain to Shell Frontier ($32,503,540 - $24,521,350) on the sale.

203. Shell Offshore then relinquished the leases as part of the settlement in 1995, resulting in an abandonment loss of $32,503,540.

204. The MMS suspended operations for the Hammerhead prospect from May 6, 1993 to May 5, 1998, and extended the lease expiration date to September 30, 1999.

205. Shell Frontier leased its East Cat Canyon (California-onshore) mineral fee and "farmed out" its East Cat Canyon leasehold acreage to CalResources LLC in 1997 for $100,000 and received a 1.5% lessor's royalty on the mineral fee and retained a 1% overriding royalty interest in the leasehold acreage.

48

206. "Farmout" of a leasehold refers to a transfer of the leasehold to another while retaining an overriding royalty interest with a back-in interest in the leasehold.

207. Shell Frontier "farmed out" the offshore Santa Maria Basin leases to CalResources LLC for $100,000 in 1997, retaining a 1% overriding royalty interest.  Shell Frontier's 1% overriding royalty interest was later sold to Denver Oil & Mineral Corporation in December 1998 for $150,000.

208. All 100 Chukchi Sea Lease Sale 109 leases transferred to Shell Frontier on September 1, 1992, were surrendered to the MMS as follows:

| Date Prior to | # | Cumulative % of Total | Basis (millions) | % of Total |
|---|---|---|---|---|
| July 1993 | 29 | 29% | $49.2 | 27% |
| July 1994 | 63 | 92% | 75.2 | 42% |
| July 1995 | 8 | 100% | 55.6 | 31% |
|  | 100 |  | $180.0 | 100% |

209. As a result of Shell Frontier's abandonments of the Chukchi Sea leases acquired in Lease Sale 109, no annual rental payments were made on such leases after July 1, 1994.

210. Shell Frontier relinquished the Itkillik Lease (Alaska onshore-North Slope) to the MMS in April 1994 and claimed an abandonment deduction of $332,474.

211. In 1992, Shell did not have any definite plans to drill additional test wells in the Chukchi Sea.  To date, no additional

drilling has occurred in the Chukchi Sea since the completion of the Chevron well drilled in the Diamond (Iron Thunder) prospect in 1992.   However, other types of exploration activities have occurred, such as the analysis of seismic data.

212. There was no drilling of test wells conducted in the Alaska OCS by Shell Oil after 1991.

213. As of September 1, 1992, Shell had not recorded in its petroleum reserves any amounts for its federal leases located in the Chukchi Sea or the Beaufort Sea, since its Chukchi Sea and Beaufort Sea leases were still in the exploration stage.

214. Shell Frontier's 1994 Consolidated Capital Budget and Exploratory Operating Program was $45,250,000 and the component capital expenditure levels for the consolidated 1994 program totaled $33,750,000.

215. In 1994, Shell Frontier sold its interest in the Seal prospect to British Petroleum for $950,000.   The Seal prospect is currently in production as part of the Northstar Project.   The Northstar Project began production in October 2001.   As of the end of 2006, over 19 million barrels of oil had been produced from the federal leases in the Northstar Project.

216. Shell Frontier's interest in the Seal prospect had an adjusted tax basis of $54,801,000 at the time of the sale, and therefore Shell Frontier reported a tax loss of $53,851,000 on the sale.

217. Shell Frontier relinquished the 5 Hammerhead leases (Beaufort Sea) to the MMS by December 1998, and claimed abandonment deductions totaling $25,174,299.

218. The MMS's views on the Hammerhead and Seal Prospects are found in the 2006 MMS report "Chukchi Sea Planning Area (Alaska) Province Summary: *2006 Oil and Gas Assessment*," identified as Plaintiff's Exhibit 251.

219. Of the 186 Chukchi Sea leases awarded at Lease Sale 109 (1988) to companies other than Shell and its partners, all were surrendered to MMS as follows:

| Date Prior to | # | Cumulative % of Total |
|---|---|---|
| July 1992 | 118 | 62% |
| July 1993 | 29 | 79% |
| July 1994 | 39 | 100% |
| | 186 | |

220. Shell Frontier took depletion deductions of approximately $10.4 million in 1994 with respect to the Poso Creek properties (California onshore).

221. Shell Frontier took abandonment deductions of $226,975 in 1995 with respect to the Poso Creek properties.

222. In 1995, Shell Frontier sold all of its lease interests in the Poso Creek properties to E&B Natural Resources Management Corporation for $645,000.

223. Shell Frontier recognized a $108,809 capital loss on the Poso Creek sale.

224. In the aggregate, Shell Frontier claimed deductions of approximately $10.7 million related to the Poso Creek assets transferred by Shell Western.

225. The Bennett Ranch (Texas) property transferred by Shell Western to Shell Frontier was sold by Shell Frontier to Shell Everest Inc. in 1997 for $46,512,869, resulting in a tax loss of $100,672,849.

226. By the end of 2003, Shell Frontier had sold nearly all of the Gulf of Mexico lease interests that had been transferred to Shell Frontier by Shell Offshore and Shell Royalties in September 1992.

227. In December 2006, the Bureau of Land Management issued three Oil Shale Research, Development and Demonstration Leases to Shell Frontier, pursuant to the 2005 Energy Act, to demonstrate Shell's In-Situ Conversion Process technology. Under the terms of these grants, if successful, Shell Frontier will be granted the right to develop commercially about 15,000 acres of property rich in oil shale deposits.

228. Shell Frontier has retained ownership of substantially all of the Colorado oil shale properties that were transferred to it by Shell Western. Furthermore, the only oil shale properties that Shell Frontier disposed of were exchanged by Shell Frontier for other oil shale properties.

229. Shell Frontier redeemed all of its outstanding shares of auction rate preferred stock on August 1, 2005, giving members of the Shell Group 100% ownership of Shell Frontier and resulting in Shell Frontier's becoming a member of the Shell consolidated group for federal tax purposes.

230. For taxable periods beginning after August 1, 2005, through the date hereof, Shell Frontier has joined in the filing of the Shell Group's consolidated federal income tax returns.

XIV. Certain Other Events

231. From the late 1980s through the mid-1990s Shell expended approximately $2 billion drilling wells and building platforms, facilities, and pipelines to gathering locations for two prospects (Auger and Mars) in previously undeveloped deep-water fields in the Gulf of Mexico.

232. Conoco, an active participant in Chukchi Lease Sale 109 and a partner with Shell on the majority of Shell leases acquired by Shell in that sale, relinquished all of its lease interests acquired in Lease Sale 109 in 1991 to three of its partners: Shell Western, Exxon, and Elf Aquitaine.

233. In 1993, the MMS issued a suspension with respect to the California OCS leases held by Shell Frontier and others, halting all activity on the leases.   Although the suspensions were

scheduled to end in December 1995, the MMS extended them through July 30, 1999.

234. The MMS is putting Alaska offshore leases up for sale at auction.  In MMS Lease Sale 195 in March 2005, Shell Offshore acquired 84 leases in the Beaufort Sea for a total initial bonus payment of $44.3 million.  Another sale of leases in the Beaufort Sea occurred on April 18, 2007.  The MMS is also planning a sale of leases in the Chukchi Sea and currently expects such sale to occur sometime in 2008.

## Additional Findings of Fact

**From a preponderance of the evidence, the Court additionally finds as follows:**

235. In response to the financial and business crisis that Shell confronted in 1991 and 1992 (*see* Agreed Findings of Fact Nos. 25-34), Shell's President and Chief Executive Officer Frank Richardson set as the number one corporate goal the improvement of Shell's return on investment along with an improvement in its cash flow.  He envisioned the keys to success as entailing (i) investment for increased production; (ii) reduction of costs; and (iii) the restructuring of assets to enhance productivity.

236. Shell implemented this three-pronged strategy by cutting over 30% of its workforce, divesting certain assets and business operations, and restructuring others.  The company sought to

54

maximize its return on producing oil and gas assets while scaling back on its exploration and development of more challenging "frontier" properties, but at the same time sought to preserve the frontier properties for future development.

237. In addition to slashing its workforce from 32,000 employees in 1990 to about 22,000 employees in 1993, Shell within this period of time executed at least seven distinctive initiatives to help attain the objectives set by Richardson, one of which initiatives led to the formation of Shell Frontier. (*See* Agreed Finding of Fact No. 35.)

238. The ideas for raising cash, reducing debt, restructuring assets, selling assets, and the like, emerged from different business units, managers, and executives in the company, including the tax department, which suggested one of the seven major initiatives.

239. Shell's tax department from time to time in the past had suggested business transactions, some of which were accepted and others of which were rejected.

240. Steven Stryker, Shell's Vice President and General Tax Counsel, conceived the transaction that involved the formation of Shell Frontier.

241. Stryker presented to Richardson his proposal to form a new E&P subsidiary, later named Shell Frontier, to which selected producing properties and non-producing properties would be

transferred, and which subsidiary would issue readily marketable auction preferred stock, thereby achieving the objectives of raising cash without debt and at low cost, maintaining control over Shell's producing properties, and preserving its non-producing properties thought to have substantial future potential.

242. Stryker told Richardson that he expected this transaction could raise substantial cash, which Richardson later understood to be from $100 million to $200 million, by the sale of auction preferred stock to outside investors, and would permit Shell still to maintain control of the income-producing properties transferred to Shell Frontier. Jack Little, Executive Vice President of Shell Exploration and Production, with whom Richardson also consulted, was of the opinion that Shell's non-producing assets, which Shell desired to preserve, could be better managed, that is, at less cost of manpower and time, in the new entity. Richardson regarded this as a "positive kicker" for the company better to manage its properties in Shell Frontier. Moreover, Richardson did not want a "net income hit" from selling or relinquishing properties that he believed had long term value.

243. Although Stryker recognized the tax advantage of transferring high basis frontier properties to Shell Frontier in exchange for auction-preferred stock, which Shell Frontier could later sell at substantial losses, he refrained from discussing the tax consequences of the overall proposal with any of "Shell's

businessmen" so that Richardson would evaluate the proposal and reach his conclusion based only upon a non-tax business assessment of the restructuring proposal.

244. In 1991 and 1992, with dramatically lower oil prices and, for example, no existing infrastructure to transport significant quantities of oil and gas from the Chukchi Sea to an onshore collection point, market conditions dictated no immediate exploration or development in Shell's Chukchi Sea, Beaufort Sea, and Alaskan North Slope properties.

245. Richardson and other long-time Shell executives, however, still had a fresh memory of Shell's mistaken withdrawal from the Alaskan North Slope and Prudhoe Bay in the early 1960s, not long before others achieved fabulous returns on their exploration in Prudhoe Bay, which became the largest oil and gas field in the United States. Richardson, therefore, desired for Shell to hold its frontier properties in Alaska and to complete its study of data derived from the exploratory wells it drilled there, while hoping for improved oil prices that would justify further exploration in what he believed to be valuable properties in a promising area.

246. In fact, in the two decades leading up to the Shell Frontier transaction, Shell had dedicated the largest proportion of its capital expenditures toward aggressively exploring and developing its frontier properties.

247. In 1992, Shell still held more than half of the Chukchi leases that it had acquired in MMS's huge Lease Sale 109 in 1988. Richardson was persuaded that an effective way to preserve these assets would be to place them in a separate entity, apart from properties that were still being actively explored with Shell's diminished cash flow resources. Some Shell executives corroborated the wisdom of isolating the frontier properties so as to remove from Shell's reduced numbers of geologists and other specialists the temptation to spend their time studying the potential of frontier properties, which were not immediate candidates for further exploration given Shell's difficult financial condition and the severely depressed state of oil prices.

248. Richardson was also impressed by the significant amount of cash that could be raised by Shell Frontier issuing auction-preferred stock ("APS"), some of which could be sold to outside third parties in a private placement offering. This also would fulfill one of his immediate objectives, namely, to raise cash and to reduce debt.

249. The typical purchaser of APS is primarily interested in making a short-term investment that will pay regular dividends.

250. Richardson was persuaded at the time that the new entity, Shell Frontier, would conserve human resources, realign management focus, maximize the productivity of some assets, ensure the

preservation of others, and raise a significant amount of cash through the sale of auction-preferred shares.

251. Richardson approved the Shell Frontier transaction and communicated his decision to his subordinates to complete it.

252. After approving the plan, Richardson himself spent very little time on the Shell Frontier deal, especially in comparison to his active engagement in other ongoing major business strategies such as Shell's sale of its mining business in 1992 and the formation of a strategic partnership with PEMEX in 1993.

253. Shell Frontier had its own budget and operating plan. Although the same individuals managed the frontier properties before and after their transfer to Shell Frontier, their management activities with respect to the Shell Frontier properties was compartmentalized from their management of Shell Western properties.

254. Shell employed American Appraisal Associates ("AAA") to provide an opinion on the value of the assets being conveyed to Shell Frontier by Shell Western, Shell Offshore, and Shell Royalties, which opinion was used as a basis for the exchange of the common stock, preferred shares, and auction-preferred shares transferred to those entities.

255. AAA's opinion admittedly was "not intended to represent the amount that might be realized from piecemeal distribution of the property in the marketplace or from some other use of the

property," but was based upon continuation of current operations and appraised as "part of an operating entity." Thus, because the opinion was based "on the premise of continued use," AAA estimated the "value of the business enterprise for each property." To estimate the value of a business enterprise, AAA used "the present worth of future net cash flows from projected operations, using a version of the income approach referred to as the discounted net cash flow technique." Hence, present value was attributed only to those oil, gas, and other mineral properties that were in and had a history of production and therefore could be subjected to a discounted net cash flow analysis.

256. Although AAA understandably could not ascribe a discounted net cash flow value to Shell's non-producing oil shale property in Colorado and its non-producing oil and gas leases in offshore Alaska and California, those properties transferred by Shell Western to Shell Frontier did in fact all have some value and were not, as the Government argues, of "zero value."

257. AAA appraised the oil shale properties in Colorado at a value of at least $11.6 million based only upon the surface and associated water rights, with no attribution of value to the oil shale itself. Shell owned more than 26,000 acres of oil shale properties that had not been severed from the surface. The Mahogany Prospect alone consisted of more than 16,000 acres of land, with oil shale deposits of 600 to 1,000 feet in thickness.

Royal Dutch Shell's chief scientist, Harold Vinegar, testified that these deposits are estimated to hold 16 to 17 billion barrels of shale oil reserves that would exceed by at least 1.5 billion barrels the total amount produced and remaining in Prudhoe Bay, the largest discovery of conventional reserves in the United States. Shell for the most part owned the land and oil shale properties in fee, unsevered from the mineral estate.  Although they were not in production, and therefore had no discounted net cash flow value for AAA's business enterprise report, the oil shale properties had market value far in excess of the mere surface and water rights.

258. The traditional method for extracting hydrocarbons from oil shale used in countries such as Estonia and China involves grinding and crushing oil shale mined from the surface.  In contrast, Shell's method, developed through research at a cost of millions of dollars, involves heating the oil shale in the ground, causing it to expel the hydrocarbon product.  Unlike the thick, tarry hydrocarbon material produced through surface-mining techniques, Shell's method produces a light, hydrogen-rich condensate of very high quality.

259. Both Shell and other unrelated oil companies widely regarded the Alaska offshore leases in 1992 and 1993 as having value, so much so that they continued to pay to the Government millions of dollars in annual delay rentals in those years to preserve numbers of those leases.

61

260. From 1992 to 1994, the order in which Shell Frontier and other companies unrelated to Shell relinquished their leases in the Chuckchi Sea was nearly identical.

261. As late as 1994 Shell Frontier sold its non-producing interests in the Seal Prospect in the Beaufort Sea to British Petroleum for $950,000, even though only four years remained on the lease, a further indication from the marketplace that Alaska offshore leases had market value in 1992 when Shell Western transferred its interests in that region to Shell Frontier.

262. According to Little, Shell had built a platform to develop its offshore California leases before transferring them to Shell Frontier. However, production efforts were blocked by the State of California, which withheld permits needed to construct a pipeline to transport oil and gas to onshore processing plants.

263. Sometime after its formation, Shell Frontier subleased the California offshore leases previously owned by Shell Western to AERA Energy, LLC, a Shell/ExxonMobil joint venture. The Court of Federal Claims in Amber Resources Co. v. United States, 68 Fed. Cl. 535 (2005), awarded over $1 billion in damages to AERA Energy, LLC, and other leaseholders affected by the MMS's suspension of all drilling-related activities on the California Outer Continental Shelf from 1993 to 1999. According to Shell, over $689 million of this award was solely attributable to the offshore California leases transferred by Shell Western to Shell Frontier.

264. There is no evidence that the Secretary or his delegate made any allocation or other determination under 26 U.S.C. § 482.

## **Legal Analysis of Controlling Facts**

I.   Transfers to Corporation Controlled by Transferor Under Section 351

A.   Purpose and effects of § 351

Section 351 of the Tax Code provides:

No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

26 U.S.C. § 351(a).  The "control" requirement is satisfied if, immediately after the transfer, the transferors own at least "80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the [transferee] corporation."  § 368(c).

Courts have characterized Section 351's deferment of tax on qualifying exchanges of property for stock as intended to encourage the organization of new corporations for valid business purposes. *See* Campbell v. Wheeler, 342 F.2d 837, 838 (5th Cir. 1965); *see also* Bongiovanni v. Comm'r, 470 F.2d 921, 924 (2d Cir. 1972)

63

(characterizing § 351 as "a relief provision to encourage tax-free business reorganizations"); <u>Adams v. Comm'r</u>, 155 F.2d 246 (3d Cir. 1946) (describing the purpose of § 112(b)(5), the predecessor to § 351 "to permit, tax free, legitimate reorganizations required in order to strengthen the financial condition of the corporation" (internal quotations omitted)).  An exchange that meets the criteria in § 351 assumes "nothing more than a nominal change in the form of ownership," <u>Peracchi v. Comm'r</u>, 143 F.3d 487, 489, 490 (9th Cir. 1998) (Kocinzski, J.) (likening such an exchange to "moving a billfold from one pocket to another"), and does not alter the taxpayer's basic position, <i>see</i> <u>Easson v. Comm'r</u>, 294 F.2d 653, 660-61 (9th Cir. 1961) (discussing § 112(b)(5).  As one court explained,

> There is, in short, a transfer in form only, a technical transfer not one of substance.  The section is designed to give present tax relief for internal rearrangements of the taxpayer's own assets, accompanied by no sacrifice of control and no real generation of income for the owner--and to defer taxation until a true outside disposition is made.

<u>E.I. Du Pont de Nemours & Co. v. United States</u>, 200 Ct. Cl. 391, 471 F.2d 1211, 1214 (1973); <i>see also</i> <u>Helvering v. Cement Investors</u>, 62 S. Ct. 1125, 1128 (1942) (explaining that the legislative history to § 112(b)(5) reflects its purpose of allowing "'readjustments' without present recognition of gain or loss"); <u>Merck & Co. v. United States</u>, 24 Cl. Ct. 73, 82 (1991)

(characterizing § 351 exchanges as "revealing illusory or artificial relinquishment of control").

A valid § 351 exchange has several significant consequences. The transferee corporation does not at the time of transfer recognize a gain or loss on the receipt of the property given in exchange for its stock. *See* § 362(a); Merck & Co., 24 Cl. Ct. at 83. The transferor's basis in the transferred property becomes its basis in the stock received in the exchange. *See* 26 U.S.C. § 358(a)(1); Merck & Co., 24 Ct. Cl. at 83. It is this carrying-over of the taxpayer's basis in the transferred assets that "insures that any gain or loss realized but not recognized will not escape taxation but is simply deferred." Reef Corp. v. Comm'r, 368 F.2d 125, 130 (5th Cir. 1966). Also, the law in effect at the time of the underlying events permitted the transferor's basis in the transferred property to be carried over to become the transferee's basis in the property, even if that basis exceeds the fair market value of the property.[1] *See* § 362(a)(1). A qualifying Section 351

_____

[1] Congress has since changed the law so that in Section 351 exchanges occurring after October 22, 2004, transfers of property with built-in losses require that either the transferee's basis in the transferred property, or, if the transferor so elects, the transferor's basis in the stock received, is reduced to fair market value. *See* Pub. L. 108-357, 118 Stat. 1596 (codified as amended at 26 U.S.C. § 362(e)(2) (2004)). Hence, as Shell points out, Shell Western's transfer to Shell Frontier of its producing and non-producing properties had occurred under the 2004 amendment, Shell Western still would have had the right to take the stock it received with a cost basis equal to that of the properties it transferred to Shell Frontier, just as Shell claims here. By making that election, however, under the 2004 amendment Shell

exchange under the law in 1992 therefore contemplated the possibility of a double tax loss--one on the part of the transferee upon disposition of the transferred property, and another, by the transferor upon disposition of the stock received.

B.    <u>The Formation of and Property Transfers to Shell Frontier</u>

Shell's decision to create Shell Frontier as a new subsidiary within its exploration and production division, to which it transferred numerous interests in real property held by other subsidiaries in exchange for various types and amounts of stock, typifies a § 351 internal restructuring of assets. Moreover, Shell has proven significant business reasons for taking this action. In 1991, Shell faced a serious financial crisis, reflected in the decline of its net income by 98%, a meager .1% net return on investment--well short of Shell's goal of 10% to 12%--and mounting debt that resulted in a downgrade to Shell's credit rating. The price of oil had declined drastically after the Gulf War. Responding to this crisis, Shell's leadership formulated a strategy to combat these business and economic exigencies, with its central goals being to improve return on investment and cash flow by investing to increase production, restructuring assets, and cutting

---

Frontier's basis in the properties would be reduced to fair market value as of the date of exchange. Regardless, Shell Frontier's tax liability is not at issue in this case, and, of course, this case is governed by the pre-2004 statute.

costs.  Shell implemented this three-pronged strategy by cutting over 30% of its workforce, divesting certain assets and business operations, and restructuring others.  Shell also redoubled its efforts to maximize its return on currently-producing oil and gas assets, while scaling back its exploration and development of more challenging prospects.

At the same time, Shell believed that to jettison its long-term asset portfolio would not serve Shell's ultimate business interests.  For two decades Shell had dedicated the largest portion of its capital expenditures toward acquiring and aggressively developing properties it believed to have tremendous potential but which by 1992 were not commercially feasible to produce as a result of low oil prices and technological constraints.  Shell's management believed there was strategic and potential value in maintaining under Shell's control certain of these non-producing assets until advances in technology and/or improved economic circumstances permitted their profitable development.

The Shell Frontier transaction was but one of many efforts undertaken by Shell in the ordinary course of its business to cope with the confluence of factors that were negatively impacting Shell's bottom line.  One of its objectives was to raise cash from outside parties without increasing debt and further worsening its credit rating.  Another objective was to consolidate both producing and non-producing properties previously scattered amongst several

Shell E&P subsidiaries within a single entity in order to conserve human resources, realign management focus, and maximize productivity of some assets while ensuring preservation of others. Shell believed the latter objective could be accomplished by forming a new subsidiary for what it deemed its "frontier" properties. After consulting with outside advisors, Shell determined that it could also accomplish the former objective of raising cash by causing its new subsidiary to issue and sell shares of auction preferred stock ("APS") to outside investors.

Shell therefore created Shell Frontier in September, 1992, and transferred to it various assets from other Shell E&P subsidiaries Shell Western, Shell Offshore, and Shell Royalties. Shell Offshore and Shell Royalties transferred to Shell Frontier highly productive properties in the Gulf of Mexico in exchange for common and non-voting preferred stock in Shell Frontier. Shell Frontier also issued 2,000 shares of APS, of which 1,100 shares were immediately transferred to outside investors in exchange for $110 million, and 900 shares were issued to Shell Western in exchange for certain of its producing and non-producing properties. It is undisputed that after all of the foregoing exchanges, the transferors together had "control" of Shell Frontier by reason of their combined ownership of greater than 80% of all outstanding shares and of the voting stock in Shell Frontier.

Although Shell Frontier's formation involved § 351 exchanges of numerous properties for stock between three different subsidiaries and Shell Frontier, the sole dispute in this case pertains to one subset of the properties transferred by Shell Western in exchange for APS issued by Shell Frontier.  Hence, the Government does not challenge any exchange transfers of property made to Shell Frontier by Shell Offshore or Shell Royalties, nor does it challenge Shell Western's exchange transfers to Shell Frontier of producing properties in Texas and onshore California. Instead, it singles out for denial that portion of Shell's claimed tax loss attributable to Shell's basis in non-producing Colorado oil shale properties and offshore oil leases in California and Alaska that were also transferred in exchange for APS.  If non-recognition of gain or loss on that exchange is proper under § 351, then Shell Western's $679,335,936 aggregate tax basis in the transferred properties, $470,489,625 of which derives from the non-producing properties, carries over to form both its basis in the APS, and Shell Frontier's basis in all the transferred properties. *See* 26 U.S.C. §§ 351(a), 358(a)(1), 362(a).  If so, Shell, through Shell Western, is entitled to realize a portion of the tax loss built-into these properties upon Shell Western's sale of 540 shares of Shell Frontier APS in December, 1992, for $54 million.  Because outside parties controlled more than 20% of the voting power of all outstanding Shell Frontier stock, Shell Frontier was not considered

part of the Shell consolidated tax group for tax purposes.  Hence, Shell Frontier on its separate tax return may also be entitled to realize losses on the Shell Western properties upon their disposition.

II.   <u>"Property" within the Meaning of § 351</u>

Shell obtained from the AAA a "business enterprise" value of the properties Shell transferred to Shell Frontier, which depended on a discounted net cash flow technique.  Because the non-producing properties transferred by Shell Western necessarily had no discounted net cash flow value and were not otherwise appraised for market value, the Government pejoratively calls them "Zero Value Properties" and argues that they therefore do not qualify as "property" under Section 351.  Thus, argues the Government, if not "property," they cannot qualify for non-recognition under § 351, which requires a transfer of property in exchange for stock.  "'A fundamental canon of statutory construction instructs that in the absence of a statutory definition, we give terms their ordinary meaning.'" <u>Kornman & Assocs., Inc. v. United States</u>, 527 F.3d 443, 451 (5th Cir. 2008) (applying this principle to partnership taxation provisions in the tax code (quoting <u>In re Rogers</u>, 513 F.3d 212, 224 (5th Cir. 2008))); *see also* <u>G.M. Trading Corp. v. Comm'r</u>, 121 F.3d 977, 981 (5th Cir. 1997).

The Tax Code does not define "property," and courts have construed the term broadly in the context of § 351, consistent with the statute's purpose of promoting the formation of corporations over which the taxpayer maintains continuity of control.  *See* United States v. Stafford (Stafford II), 727 F.2d 1043, 1052 (11th Cir. 1984); E.I. Du Pont De Nemours & Co., 471 F.2d at 1218; *see also* 11 MERTENS LAW OF FEDERAL INCOME TAXATION § 43A:09.  For example, courts have construed "property" within the meaning of § 351 to include a non-exclusive license of a patent, *see* E.I. DuPont de Nemours & Co., 471 F.2d at 1218-19, accounts receivable, *see* Hempt Bros., Inc. v. United States, 490 F.2d 1172 (3d Cir. 1974), installment obligations, *see* Hartford-Empire Co. v. Comm'r, 137 F.2d 540, 543 (2d Cir. 1943), and, notably, carved-out oil payments, *see* H.B. Zachry Co. v. Comm'r, 49 T.C. 73, 80 & n.6 (1967).  Indeed, the Fifth Circuit has recognized that "property" within the meaning of § 351 "encompasses whatever may be transferred . . . ."  In re Chrome Plate, Inc., 614 F.2d 990, 995 (5th Cir. 1980) (citing Hempt Bros., Inc. v. United States, 354 F. Supp. 1172, 1175 (M.D. Pa. 1973), *aff'd* 490 F.2d 1172 (3d Cir.), *cert. denied*, 95 S. Ct. 44 (1974)).

Under the Government's construction of the term, "property" does not include assets such as the Shell Western non-producing properties because, while not producing, they had no discounted net cash flow value.  But the statute itself contains no such

71

limitation.  At least one court has implicitly construed § 351(a) not even to require that the transferred property have a fair market value in excess of zero.  *See* <u>Abbrecht v. Comm'r</u>, T.C. Memo 1987-199, 53 T.C.M. (CCH) 611 (1987) (holding § 351 applied to debt exchanged for stock, although the value of the debt was not shown to have a fair market value greater than zero).

The Government cites only one case in support of its contention, which involved a taxpayer's exchange of stock in a wholly insolvent corporation that had been placed in receivership, in exchange for stock in a newly-formed corporation.  *See* <u>Meyer v. United States</u>, 121 F. Supp. 898, 903, 905 (Ct. Cl. 1954) (analyzing a putative § 112(b)(3) transaction).  Under those circumstances, the court concluded that nothing of value was given in consideration for the stock of the transferee corporation and, hence, there was no "exchange" within the meaning of the statute. <u>Id.</u> at 905-06.  This observation in <u>Meyer</u> has been cited twice in dicta, once by the Fifth Circuit, and later, by the Eleventh Circuit on subsequent appeal of the same case.  *See* <u>Stafford v. United States</u>, 611 F.2d 990, 995 n.6 (5th Cir. 1980) (discussing <u>Meyer</u> in the context of § 721, the partnership corollary to § 351); *see also* <u>Stafford II</u>, 727 F.2d at 1049 n.9.

Unlike <u>Meyer</u>, the disputed properties in this case include oil shale interests in Colorado unsevered from the surface estate and largely owned by Shell in fee simple, and oil and gas leases in

72

offshore Alaska and California.  All fit the classical--indeed, paradigmatic--definition of "property" in that they are identifiable and transferable real property interests.  These properties are wholly different from "absolutely worthless stock" that was deemed insufficient to support a § 351 exchange in <u>Meyer</u>, 121 F. Supp. at 905.

Moreover, the unremarkable fact that property producing no cash flow has no discounted net cash flow value does not establish that the property has no value.  For instance, although the AAA report rendered an opinion that it was not economic in the foreseeable future to mine the Colorado oil shale and therefore attached no present business enterprise value to the minerals, the Mahogany Prospect alone had oil shale deposits of 600 to 1,000 feet in thickness, containing an estimated 16 to 17 billion barrels of shale oil.  The latter would exceed by at least 1.5 billion barrels the total amount produced and remaining in Prudhoe Bay, the largest producing field in the United States.  The Government's only excuse for claiming these vast reserves had "zero value" is the fact that the AAA report found at the time that they had no discounted net cash flow, or present business enterprise value.  It is unreasonable to infer from that appraisal approach, however, that the oil shale itself had no market value.  Moreover, the Government's approach is artificially to impose a "severance" of the mineral estate that was not proven to have occurred on the

Mahogany Prospect or on most of Shell's other holdings.  In fact, Shell evidently owned in fee simple, surface and associated water rights and enormous oil shale reserves, in more than 26,000 acres of oil shale properties.  Only 40 acres of its oil-shale interests are shown to have been severed from the surface estate. The evidence reflects that these rich oil shale properties had far greater value than their mere surface and water rights.

With respect to the California offshore leases, Shell had built a platform to develop some of those tracts but suffered a set-back when the State of California withheld permits necessary to allow construction of a pipeline to transport oil and gas to onshore processing plants.  Although the permitting problems abated production, the known existence of substantial oil and gas reserves in the area substantiates that these assets had both strategic and long-term value at the time of their transfer to Shell Frontier. In fact, years later, AERA Energy, LLC, represented by Shell to have been a joint venture of Shell and ExxonMobil, and the sublessee of Shell Frontier, prevailed in a case challenging an MMS order suspending all activities on the California Outer Continental Shelf.  *See* <u>Amber Resources Co. v. United States</u>, 68 Fed. Cl. 535 (2005).  Of the total $1 billion damages award, $689 million was attributable to AERA's interest, which included interests transferred to Shell Frontier by Shell Western.  The prospect of

direct recovery through development, or indirectly through resolution of a lawsuit, substantiates that these offshore California leases had value, both objectively, and to Shell.

The evidence also reflects that the Shell Western Alaska offshore leases had value. First, both Shell and a number of Shell's partners paid annual delay rentals on leases in the Chuckchi Sea both before and after Shell Western's transfer of its interests to Shell Frontier on September 1, 1992. Similar payments of annual delay rentals before and after 1992 were made by third parties on Chuckchi Sea leases not held by Shell or its partners. The willingness of these knowledgeable, unrelated parties to continue making rental payments instead of selling or relinquishing the leases is evidence that these leases had value in 1992 at least equivalent to the rentals that were paid. Second, as late as 1994, Shell Frontier sold its non-producing interests in the Seal Prospect in the Beaufort Sea to British Petroleum for $950,000, even though only four years remained on the lease and the price of oil had fallen further since 1992. As a transaction between a willing buyer and seller of comparable sophistication in the industry, this *actual sale* of one of the transferred leases is persuasive of the fact that Shell's leases--however much they had fallen in value in tandem with falling oil prices--nonetheless still had some value in the marketplace in 1992 when they were transferred to Shell Frontier.

In sum, even if the Court were to accept the Government's unsupported view that real property is not "property" within the meaning of § 351 if it is lacking in value, the evidence establishes that the non-producing properties transferred by Shell Western to Shell Frontier did in fact have some value and unquestionably qualify as "property" entitled to non-recognition under § 351.

III. <u>Sham Transaction Doctrine</u>

A.   <u>Legal Principles</u>

Although Shell Western's transfer of property solely in exchange for stock in Shell Frontier literally satisfies the statutory criteria for tax-free treatment under § 351, Shell's entitlement to that portion of the claimed loss attributable to the carried-over cost basis in the non-producing properties depends on an application of the common-law "sham transaction" or "economic substance" doctrine.  "[A]s has long been recognized, the substance rather than the form of a transaction determines its tax consequences, particularly if the form is merely a convenient device for accomplishing indirectly what could not have been achieved by the selection of a more straightforward route." <u>Crenshaw v. United States</u>, 450 F.2d 472, 475 (5th Cir. 1971); *see also* <u>Comm'r v. Hansen</u>, 79 S. Ct. 1270, 1279 (1959) ("[T]he incidence of taxation depends upon the substance, not the form, of

76

the transaction . . . .”); <u>Gregory v. Helvering</u>, 55 S. Ct. 266, 267-28 (1935).

Caselaw suggests that two inquiries are relevant when determining whether a transaction’s substance accords with its form: (1) whether it was undertaken for a business purpose separate from the tax consequences; and (2) whether it possesses objective economic substance. *See* <u>Compaq Computer Corp. & Subsidiaries v. Comm’r</u>, 277 F.3d 778, 781-82 (5th Cir. 2001) (applying this two-part test). The business purpose test turns on the taxpayer’s subjective motivation for entering into the transaction. *See* <u>Kirchman v. Comm’r</u>, 862 F.2d 1486, 1492 (11th Cir. 1989). The requirement of a non-tax business purpose for entering into a tax-beneficial transaction must be viewed in light of the long-recognized principle that a taxpayer is free to “arrange his affairs that his taxes shall be as low as possible . . . .” <u>Helvering v. Gregory</u>, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J. Learned), *aff’d* 55 S. Ct. 266 (1935); *see also* <u>Blueberry Land Co. v. Comm’r</u>, 361 F.2d 93, 100 (5th Cir. 1966) (noting that a taxpayer “may utilize and exploit every available legitimate means of arranging his affairs” to maximize tax savings). “This is so because ‘nobody owes any public duty to pay more than the law demands: taxes are forced exactions, not voluntary contributions.’” <u>Atl. Coast Line v. Phillips</u>, 67 S. Ct. 1584, 1587 (1946) (quoting <u>Comm’r v. Newman</u>, 159 F.2d 848, 851 (2d Cir. 1947) (Hand, C.J.

77

Learned, dissenting)).   Indeed, as one court observed, "[a] taxpayer that does not take the tax laws into consideration when structuring complex transactions not only is naive but probably is out of business . . . ."  Merck & Co., 24 Cl. Ct. at 84-86 (holding that a taxpayer's transfer of a pharmaceutical patent to a wholly-owned subsidiary in Puerto Rico, which conferred significant tax advantages on the parent company but was partially motivated by a desire to benefit from congressionally-authorized tax incentives and labor benefits, was entitled to tax-free treatment under § 351).   Therefore, a transaction is not invalid even if it was undertaken primarily to obtain otherwise unavailable tax benefits, so long as a tax-independent business purpose exists.  *See* Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91 (4th Cir. 1985) (holding that a transaction is not invalid unless "the taxpayer was motivated by *no business purposes* other than obtaining tax benefits in entering the transaction" (emphasis added)); *see also* Compaq Computer Corp., 277 F.3d at 781, 786 (quoting Rice's Toyota World and collecting cases); In re Multiponics, Inc., 622 F.2d 709, 723 (5th Cir. 1980) ("The mere fact that tax benefits are sought is not a proper ground for invalidating the business purpose nor for attributing any evil motive to the participants.").

The second inquiry, as to whether the transaction possesses economic substance, depends on "the objective realities of the transaction, or in other words, whether what was actually done is

what the parties to the transaction purported to do." Merryman v. Comm'r, 873 F.2d 879, 881 (5th Cir. 1989).  Stated differently, to possess economic substance, a transaction must objectively and appreciably affect the taxpayer's non-tax business interests. *See* Knetsch v. United States, 81 S. Ct. 132, 135 (1960); Rose v. Comm'r, 868 F.2d 851, 853 (6th Cir. 1989) ("The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses.").  Such effects exist when the transaction objectively impacts the taxpayer's net economic position, such as creating a reasonable possibility of profit, or alters the taxpayer's legal relations. *See* Compaq Computer, 277 F.3d at 786 (holding a foreign stock transaction that resulted in pre-tax and after-tax profit possessed economic substance); United Postal Serv. of Am. v. Comm'r, 254 F.3d 1014, 1018 (11th Cir. 2001) ("The kind of 'economic effects' required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party."); ACM P'ship v. Comm'r, 157 F.3d 231, 248 n.31 (3d Cir. 1998) (requiring an objective effect on "the taxpayer's net economic position, legal relations, or non-tax business interests"); Rice's Toyota World, 752 F.2d at 91 (requiring demonstration of reasonable possibility of profit).

Because "'an income tax deduction is a matter of legislative grace,'" the taxpayer generally bears the burden of showing his

79

entitlement to a claimed deduction.  INDOPCO, Inc. v. Comm'r, 112 S. Ct. 1039, 1043 (1992) (quoting Interstate Transit Lines v. Comm'r, 63 S. Ct. 1279, 1281 (1943)); see also Woodall v. Comm'r, 964 F.2d 361, 363 (5th Cir. 1992) ("A taxpayer challenging the IRS's disallowance of a deduction bears the burden of proof."). Accordingly, the burden of proving business purpose and/or economic substance rests on the taxpayer. See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1355-56 & n.15 (Fed. Cir. 2006) (collecting cases).

The circuits are split at least three ways regarding whether a transaction must satisfy both the subjective and objective prongs of the inquiry.  Compare Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91-92 (4th Cir. 1985) (viewing as sufficient a transaction with either non-tax business purpose or economic substance); Shriver v. Comm'r, 899 F.2d 724, 725-26 (8th Cir. 1990) (adopting Rice's Toyota World), with Coltec Indus., 454 F.3d at 1355 nn.13 & 14 (expressly disagreeing with the Fourth Circuit and requiring proof of both business purpose and economic substance); United Parcel Serv. of Am., Inc., 254 F.3d at 1018 ("Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance."); Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006) (adopting the conjunctive test), and ACM P'ship v. Comm'r, 157 F.3d 231, 247 (3rd Cir. 1998) (rejecting a "rigid two-step analysis" and finding

80

that business purpose and economic substance are merely "related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes."); Gilman v. Comm'r, 933 F.2d 143, 148 (2d Cir. 1991) (noting the "flexible nature of the analysis"); James v. Comm'r, 899 F.2d 905, 908-09 (10th Cir. 1990) (same); Sochin v. Comm'r, 843 F.2d 351, 354 (9th Cir.) (same), cert. denied, 109 S. Ct. 72 (1988).

The Fifth Circuit in Compaq Computer expressly declined to decide whether proof of either economic substance or business purpose alone is sufficient, as the Fourth Circuit held, or if both inquiries are simply related factors that help to inform an overall analysis of whether the transaction is a sham, as was held by the Third Circuit. 277 F.3d at 781-82. Later, however, in determining whether to disregard a family limited partnership created by decedent two months before his death, the Fifth Circuit affirmed the Tax Court's holding that even without persuasive proof of any *business* purpose for the partnership, the objective *economic* substance of the partnership was "enough to be recognized for federal estate tax purposes." Strangi v. Comm'r, 293 F.3d 279, 282 (5th Cir. 2002). The Fifth Circuit wrote:

> [The] partnership agreement changed the legal rela-
> tionships between decedent and his heirs and creditors.
> Potential purchasers of decedent's assets would not
> disregard the partnership. As the tax court stated,
> "[r]egardless of subjective intentions, the partnership

81

had sufficient substance to be recognized for tax
purposes."

Id. Strangi did not cite nor expressly declare it was resolving
the question left undecided in Compaq, but its holding falls
directly in line with the Fourth Circuit precedent, and arguably is
not inconsistent with the Third Circuit's approach.

Under any formulation of the doctrine, "where . . . there is
a genuine multiple-party transaction with economic substance which
is compelled or encouraged by business or regulatory realities, is
imbued with tax-independent considerations, and is not shaped
solely by tax-avoidance features that have meaningless labels
attached, the Government should honor the allocation of rights and
duties effectuated by the parties." Frank Lyon Co. v. United
States, 98 S. Ct. 1291, 1303-04 (1978); see also Compaq Computer,
277 F.3d at 781 (quoting Frank Lyon).

B.   Application

The Government contends that Shell Western's transfer of non-
producing, high-basis properties with no discounted net cash-flow
value had neither economic substance nor non-tax business purpose
and served only to inflate artificially Shell's tax basis in the
Shell Frontier APS received and sold by Shell Western, and further
to generate a double tax deduction which could be realized upon
Shell Frontier's disposition of those properties.  Shell counters

that the transfer of the non-producing properties as part of the overall Shell Frontier transaction, through which Shell in 1992 raised $164 million in cash without incurring outside debt, served the legitimate, non-tax goals of improving management of these properties and preserving assets which Shell believed had significant long-term potential.

The Government makes much of the fact that the creation of Shell Frontier was proposed by Steve Stryker, Shell's Vice President of Tax.  The evidence is that Shell's CEO Frank Richardson had set overarching goals for the company to improve its return on investment, to reduce costs, and to raise cash without incurring new debt.  A variety of recommendations were made by executives and managers, from which at least seven major initiatives were adopted and executed by the company.  Only one of these seven approved recommendations came from the tax department. When Stryker presented the proposal, however, he intentionally refrained from discussing the specific tax implications of the § 351 exchange with Shell's top management or Richardson, who ultimately approved the Shell Frontier plan, in order to assure that the ultimate decision to form Shell Frontier would be made on non-tax business grounds.  The testimony of Shell's decision-makers is that Shell Frontier was formed to raise cash, preserve long-term properties, and increase management efficiency.  These proffered business purposes are consistent with Shell's contemporaneous

overall strategy of improving its return on investment and increasing cash flow by investing strategically to increase production and by restructuring some of its assets. Indeed, a taxpayer's restructuring of a going-concern is a recognized, valid business purpose. *See* <u>United Parcel Serv. of Am.</u>, 254 F.3d at 1020 (holding a transaction that "simply altered the form of an existing, bona fide business" possessed an adequate business purpose). That the Shell Frontier idea originated with Shell's tax department, which anticipated the beneficial tax consequences that might also be realized, does not undercut the testimony of Shell's executives that their authorization of Shell Frontier's formation, including the transfer of some of Shell Western's non-producing assets, was based on their legitimate cash raising, asset preservation, and management objectives.

There was also economic substance to the Shell Frontier transaction. Shell's decision-makers sought to "monetize" certain of its assets in a manner that would generate cash for the company without incurring outside debt. To this end, Shell transferred to newly-formed Shell Frontier a number of income-producing assets from Shell E&P subsidiaries--Shell Western, Shell Offshore, and Shell Royalties--that would immediately generate cash needed to pay dividends on the APS sold to outside investors. Thus, Shell was able to raise a total of $164 million in 1992 by issuing 2,000 shares of Shell Frontier APS, $110 million of which was received

84

from sales of APS to unrelated investors and $54 million of which was generated when Shell Western sold 540 of the 900 shares of APS it received in exchange for the non-producing and producing properties it transferred to Shell Frontier.

The immediate revenues anticipated from the properties transferred by Shell Western was much less than that anticipated from the properties transferred by Shell Offshore and Shell Royalties. In particular, the non-producing properties transferred by Shell Western had no near-term cash flow potential because low oil prices and technological constraints at the time rendered their immediate development uneconomic. From this perspective, and as the Government asserts, inclusion of these properties in Shell Frontier did nothing to advance Shell's objective of attracting potential purchasers of APS who, as typical short-term investors, were most concerned with Shell Frontier's ability to pay dividends.

But this view presupposes that the *only* purpose of Shell Frontier was to improve immediate cash flow. To the contrary, the evidence is that Shell attempted to strike a balance between fulfilling immediate cash flow needs and also achieving long-term goals of frugally preserving assets whose potential had not been fully realized, or for which development was infeasible under then-current economic circumstances, technology, or both. Richardson observed that one disadvantage of Shell's divesting itself entirely of the non-producing Shell Western properties would have been an

85

"income hit" that he did not desire, but more importantly, he desired to preserve these resources until such time as the economic and/or technological climate allowed for their profitable development.  Shell's intense desire to hold on to those frontier properties was driven in large part by its earlier experience in Prudhoe Bay, where Shell had withdrawn early when it believed that the prospect would not be profitable, and missed out on the fabulously successful exploration and development that later occurred.

The Government relies heavily on the Federal Circuit's decision in Coltec, which invalidated a taxpayer's claimed tax loss based on the transfer to a special-purpose subsidiary, Garrison, of a $350 million note held by Garlock, another subsidiary, solely in exchange for Garrison's assumption of Garlock's (and its subsidiary, Anchor's) contingent asbestos liabilities without taking into account the taxpayer's admittedly legitimate goal of compartmentalizing management of asbestos liabilities in a single entity.  454 F.3d at 1359.  The test applied in Coltec, insofar as it requires the taxpayer to prove both a non-tax business purpose and objective economic substance, appears inconsistent with the Fifth Circuit's articulation of the standard in Stranqi, which concluded that the decedent's formation of a family limited partnership with economic substance alone was sufficient to uphold the transaction regardless of the business purpose behind its

formation.  *Compare* id. at 1355 nn.13 & 14, *with* Stranqi, 293 F.3d
at 282.  Moreover, the Court has found no Fifth Circuit cases, and
the parties have cited none, similarly dissecting or, "slicing and
dicing" as it was referred to in oral arguments, an integrated
transaction solely because the Government aggressively chooses to
challenge only an isolated component of the overall transaction.
Indeed, commentators have criticized Coltec's disregard of the
larger context in which the intended § 351 exchange occurred.  *See,
e.g.*, STANLEY I. LANGBEIN, BANK INCOME TAX RETURN MANUAL ¶ 19.03[5][a]
(2007) (observing that Coltec's exclusive focus on the transaction
as challenged by the IRS is "controversial and controvertible in
light of existing precedent"); David P. Hariton, *When and How
Should the Economic Substance Doctrine Be Applied?*, 60 TAX L. REV.
29, 40-44 (2007) (viewing Coltec's narrow framing of the operative
transaction as rooted in a "fundamental misunderstanding" of the
Supreme Court's seminal decision in Gregory v. Helvering, 55 S. Ct.
266 (1935), which instead supports the notion that transactions
must be viewed as a whole).  It is not for this Court to criticize
the Federal Circuit's decision, but it can be observed that this
case and Coltec on the facts are very different.

Coltec involves a highly unusual set of facts where the
taxpayer, outside of its routine business activities, transferred
contingent liabilities, *i.e.*, losses that may or may not accrue, in
exchange for a note in an amount equal to the taxpayer's rough

estimate of those contingent liabilities.  In contrast, Shell's conception and execution of the Shell Frontier transaction, and the objectives to be achieved, were wholly consistent with urgent measures undertaken company-wide to cope with an unprecedented and immediate financial crisis.  The properties selected for transfer to Shell Frontier were classes of producing and non-producing properties typically owned by major oil companies such as Shell. Shell also had *real losses* in the transferred Shell Western properties, having paid significant sums to acquire these properties before the precipitous decline in oil prices, purchases prices far in excess of their probable market value at the time of exchange.  Indeed, the non-illusory nature of Shell's real losses distinguishes this case from the manufactured tax losses typically invalidated for lack of economic substance. *See, e.g.*, Knetsch, 81 S. Ct. at 134-36 (concluding the claimed deductions arose from offsetting financial obligations, not genuine indebtedness); Boca Investerings P'ship v. United States, 314 F.3d 625, 627, 632 (D.C. Cir. 2003) (denying artificial losses resulting from contingent installment sales by sham partnership between U.S. taxpayer and foreign entity); ACM P'ship, 157 F.3d at 251-52 (holding claimed losses stemming from offsetting note transactions were "purely an artifact of tax accounting methods" and not *bona fide* losses); Freytag v. Comm'r, 904 F.2d 1011 (5th Cir. 1990) (invalidating straddle transactions--agreements to purchase or sell underlying

security on a specific date structured and executed so as to achieve pre-determined tax loss sought by taxpayers); Rice's Toyota World, Inc., 752 F.2d at 91 (rejecting sale-leaseback arrangement that generated depreciation deductions).

Coltec is also distinguishable based on the objective impossibility of that taxpayer's stated goals for transferring the note in exchange for assumption of contingent liabilities. As the court explained, merely shifting the contingent asbestos liability obligations among Coltec subsidiaries could not as a matter of law or logic have achieved the taxpayer's articulated purpose of protecting Coltec's core business from veil-piercing claims, because nothing precluded third party asbestos claimants from pursuing Coltec regardless of Garrison's assumed responsibility for paying potential claims. Coltec, 454 F.3d at 1359-60.

In this case there is no equivalent logical or legal flaw in Shell's stated objectives with regard to the goals of improving management and preservation of the Shell Western properties by transferring them to Shell Frontier. Shell believed that compartmentalizing the non-producing properties in a separate entity with its own managers, budget, and operating plan would bring greater focus and discipline to the management of those assets. Although the identity of the managers did not change, their oversight of the properties after their transfer to Shell Frontier was segregated and budgeted from their management of

89

assets held by Shell Western.  It was not unreasonable for Shell to believe that this compartmentalized management could be more effective in conserving employee time and controlling costs in managing frontier properties held for future development while maximizing employee attention and efforts on currently feasible exploration and development to improve operating results and cash flow.  Corporate officials often wear different hats, and the fact that Shell utilized the same personnel to manage the properties in the hands of Shell Frontier does not undercut the reasonableness of their belief that economic benefits could result from the disciplined structure itself.  *See, e.g.*, Merck & Co., 24 Cl. Ct. at 88 ("Management of wholly owned corporations through teams of executives that hold multiple titles of director or officer is a control tool frequently used, is acceptable business practice, and is legal.").  Shell admittedly did not achieve the management efficiencies it sought.  The fact that the business strategy did not fully achieve all its objectives, however, does not mean that the strategy itself when viewed objectively could not have achieved its business objectives with proper execution.  In this, the instant case is starkly different from Coltec, where objectively viewed the transfer of contingent liabilities to Garrison could not shield Coltec from veil-piercing asbestos liability exposure.

Restructuring the Shell Western properties by moving them to a non-traditional subsidiary also allowed Shell greatly to reduce

the size of the staff overseeing these assets.  Shell had
drastically reduced its overall workforce as part of its effort to
improve the health of its business.  According to Jack Little,
Executive Vice President of Shell E&P, consolidating ownership and
management of properties previously scattered among various E&P
subsidiaries allowed Shell E&P to cut back on the number of
personnel required to administer these properties and was
consistent with Shell's reduction in force.

Transfer of the non-producing Shell Western properties to
Shell Frontier also had real and appreciable effects on third
parties.  Unlike the purely-internal shifting of liabilities
rejected in Coltec, Shell's restructuring impacted outside
investors in Shell Frontier's APS.  Those outside shareholder
investors indirectly shared in the risks and potential benefits of
all Shell Frontier's assets, including those received from Shell
Western.  Although the properties transferred by Shell Western had
varying prospects for development, with some more speculative than
others, any payoff or loss therefrom--including their sale or other
disposition--would impact Shell Frontier's finances.  Large
expenditures made by Shell Frontier to develop the non-producing
properties would decrease the company's cash flow, thereby
potentially imperiling revenues available to pay dividends to APS
holders.  Shell Frontier's management of those assets, as with all
its properties, would necessarily take into account its non-

illusory legal obligations to these investors, who were entitled to receive dividends ahead of other classes of Shell Frontier stockholders.  If the activities were to pay off, the bulk of the upside would not pass through to these outside investors; however, the resulting increase in Shell Frontier's income would render their receipt of preferred dividends more secure.  That the property transfers occurred within the Shell family of subsidiaries does not diminish the importance of these objective effects on the economic interests of parties unrelated to Shell.

Nor does the fact that Shell Frontier ultimately disposed of some of the properties, namely those in offshore Alaska, suggest that Shell did not reasonably believe in 1992 that those assets had potential benefits in the hands of Shell Frontier.  Several critical facts contradict the Government's view that Shell Frontier maintained some of these leases through 1994 rather than relinquishing them immediately after the exchange only as a facade to conceal improper tax motives.  Similar to the way these leases were managed when Shell Western owned them, the decision whether and when Shell Frontier would relinquish any given lease was made pursuant to a case-by-case assessment of the costs and benefits of maintaining the lease by paying annual delay rentals.  The pattern of Shell Frontier's relinquishments from 1992 through 1994 is similar to that of other unrelated entities that owned offshore leases in the same regions of Alaska but who are not shown to have

had the same alleged tax-driven incentives gradually to phase out ownership of these leases.  The evidence does not support that Shell had a preconceived plan to dispose of any of the properties following their transfer to Shell Frontier.

Shell Frontier also actively pursued its interests in the Colorado oil shale properties.  The company has maintained nearly all of its ownership in the oil shale properties, investing millions of dollars developing a cutting-edge in-situ oil recovery process that eschews the traditional surface-mining technique utilized in other parts of the world and that results in oil of superior quality.  Shell Frontier even subleased its California offshore properties that were ensnarled in regulatory litigation. Shell Frontier's efforts to obtain economic benefits from ownership of these and others of its frontier properties is additional evidence of the economic substance underpinning their transfer from Shell Western.

In sum, this is not a case in which the taxpayer has engineered a transaction solely for tax purposes, but one in which the taxpayer has undertaken a transaction to accomplish legitimate, non-tax objectives and has permissibly structured it so as to maximize the attendant tax benefits under then-existing law.  To be sure, Shell could have employed different means to achieve its objectives of raising capital and preserving at minimum cost its frontier properties, but the fact that Shell could have

accomplished these goals in other ways that would not have
generated the same tax benefits does not undercut the reality that
Shell's officers, in their informed business judgment, reasonably
believed that Shell's cash, asset management, and preservation
objectives could best be accomplished by creating Shell Frontier.
Indeed, Shell Frontier has continued as a *bona fide* business entity
at all times since its formation, and through 2002 had reported
more than $1 billion in taxable income upon which it paid more than
$349 million in federal income taxes.   Accordingly, the Court
concludes that the transfer of Shell Western's non-producing
properties in exchange for APS of Shell Frontier served a valid
business purpose separate and apart from any income tax benefits,
and also possessed objective economic substance.

IV.  Reallocation Pursuant to Section 482

Finally, the Government asserts in the alternative that it may
disallow Shell Western's losses under Section 482 of the Tax Code,
and reallocate those losses to Shell Frontier, a separate taxpayer
whose returns are not directly at issue in this suit.   Section 482
provides, in pertinent part:

> In any case of two or more organizations, trades, or
> businesses . . . owned or controlled directly or
> indirectly by the same interests, *the Secretary* may
> distribute, apportion, or allocate gross income
> deductions, credits, or allowances between or among such
> organizations, trades, or businesses, if he determines

94

> that such distribution, apportionment, or allocation is
> necessary in order to prevent evasion of taxes . . . .

26 U.S.C. § 482 (emphasis added).  The "Secretary" referenced in
§ 482 refers to "the Secretary of the Treasury or his delegate," in
other words, the Commissioner of Internal Revenue.  *See*
§ 7701(a)(11)(B).  Accordingly, courts have held that § 482 does
not apply unless invoked within the Department of the Treasury by
the Commissioner of Internal Revenue or other delegate of the
Secretary of the Treasury.  *See* United States v. First Sec. Bank,
334 F.2d 120, 121-22 (9th Cir. 1964) (per curiam) (holding § 482 to
be inapplicable because the record contained no indication "that
the Commissioner in this case undertook or purported to make a
determination under or pursuant to § 482"); Ruddick Corp. v. United
States, 643 F.2d 747, 749 n.7 (Ct. Cl. 1981) ("It has been held,
and we agree, that the provision cannot be utilized unless it is
invoked within the Treasury," and holding invocation of § 482 by
the District Director, as delegate of the Secretary of the
Treasury, was proper).

The notice of deficiency sent to Shell by the Commissioner of
Internal Revenue contains no determination by the Commissioner
pursuant to § 482 as a basis for denying Shell's claimed refund.
Nor has there been any showing that the Commissioner has undertaken
at any point to make an allocation pursuant to § 482.  Indeed, no
mention of § 482 was made by the Government during the entire

course of this litigation until less than a month before trial. Even then, the Government's briefs and trial presentation make only passing reference to § 482.

Although the Government represented in its opening statement that it would provide either a witness or a document demonstrating that the IRS, upon referral of this case to the Department of Justice, had invoked the statute, no such evidence was presented at trial. Instead, the Government switched its position entirely at the close of trial and insisted that *Shell* had not substantiated that the Department of Justice was *not authorized* to invoke § 482. The Government's attempt to shift the burden to Shell to prove that the Commissioner did not have authority to act turns § 482 on its head. The statute requires the Secretary *first* to make a determination and to act pursuant thereto. The record here is silent--notwithstanding the Government's promises of proof--that the Secretary ever made such a determination or purported to take any action under § 482.

Even assuming, however, that the Secretary did act under § 482, Shell's claimed deduction stemming from the § 351 exchange of Shell Western properties for APS in Shell Frontier would still be upheld because it is not an improper attempt to evade taxes. Instead, for the reasons stated above, Shell's restructuring conformed with Congress's purpose for allowing such tax-free exchanges, and served legitimate business objectives. *See, e.g.,*

96

Stewart v. Comm'r, 714 F.2d 977, 989 (9th Cir. 1983) (observing that whether § 482 reallocation is appropriate to avoid tax evasion is determined by reference to the form-over-substance doctrine); Merck & Co., 24 Cl. Ct. at 85 (rejecting tax-avoidance motives as a basis for § 482 reallocation because of the taxpayer's "sound business reasons" for choosing to relocate its production facilities in Puerto Rico); G.D. Searle & Co. v. Comm'r, 88 T.C. 252, 359 (1987) ("[A] section 482 allocation . . . will be upheld where the challenged transaction was arranged solely to avoid taxes and without a valid business purpose."). In sum, Section 482 provides no basis to deny Shell's claimed tax deduction.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1).

2.   Venue is proper pursuant to 28 U.S.C. § 1402(a)(2).

3.   Shell Western's transfer of its producing and non-producing properties to Shell Frontier in exchange for auction preferred stock issued by Shell Frontier qualified for non-recognition of gain or loss under § 351(a) of the Internal Revenue Code of 1986, 26 U.S.C. *et. seq.* (Except as otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect in 1992.).

4.   Pursuant to § 358(a)(1), the 900 shares of Shell Frontier stock received by Shell Western had an adjusted basis equal to $679,335,936, Shell Western's adjusted basis in the property that it transferred to Shell Frontier.

5.   Shell Western recognized a capital loss on its December 2, 1992, sale of 180 shares of Shell Frontier stock equal to $117,867,187.72, the difference between the adjusted basis of the shares sold ($135,867,187.20) and the amount realized on the sale ($18,000,000).

6.   Shell Western recognized a capital loss on its December 9, 1992, sale of 180 shares of Shell Frontier stock equal to $117,867,187.72, the difference between the adjusted basis of the shares sold ($135,867,187.20) and the amount realized on the sale ($18,000,000).

7.   Shell Western recognized a capital loss on its December 16, 1992, sale of 180 shares of Shell Frontier stock equal to $117,867,187.72, the difference between the adjusted basis of the shares sold ($135,867,187.20) and the amount realized on the sale ($18,000,000).

8.   Shell Western's exchanges of producing and non-producing properties to Shell Frontier in exchange for Shell Frontier's auction preferred stock, and Shell Western's subsequent sales of Shell Frontier auction preferred stock, was not a sham transaction, had valid substantive business purpose apart from its tax

98

consequences, and had objective economic substance also affecting unrelated third parties.

9.  The Government may not disallow Shell Western's capital losses from its sales of Shell Frontier stock under the sham transaction doctrine or as an invalid § 351 transfer.

10.  The Government may not under § 482 reallocate or deny the capital losses that Shell Western claimed upon its sales of Shell Frontier APS in 1992.

11.  Taking into account Shell Western's capital losses of $353,601,562 from its sale of Shell Frontier stock, the Shell Group had a consolidated net capital loss of $320,046,836 for its 1992 taxable year.

12.  The Shell Group was entitled to carry the 1992 consolidated net capital loss back to the 1990 taxable year and offset it against consolidated capital gain net income for that year.

13.  Shell is entitled to a federal income tax refund of $18,971,341, plus interest, from the Government with respect to its 1990 taxable year.

14.  If any of the foregoing Findings of Fact (including those facts stated in the Legal Analysis of Controlling Facts) constitute conclusions of law, they are adopted as such.  If any of the foregoing Conclusions of Law (including those set forth in the Legal Analysis of Controlling Facts) constitute findings of fact, they are adopted as such.

**ORDER**

For the reasons set forth in the foregoing Findings of Fact, Legal Analysis, and Conclusions of Law, it is

ORDERED that Shell Petroleum, Inc. shall have and recover from the United States a refund in the amount of Eighteen Million Nine Hundred Seventy-One Thousand, Three Hundred Forty One Dollars ($18,971,341) for the 1990 taxable year based on the carryback of its 1992 consolidated net capital loss, together with prejudgment interest thereon as provided by law. It is further

ORDERED that the parties by July 14, 2008, shall jointly calculate and submit to the Court the amount of prejudgment interest that will have accrued on the foregoing refund to July 14, 2008, and shall also advise the Court of the daily rate of interest accruing on and after July 14, 2008, until the date that the Court enters its Final Judgment. The Government's agreement to the accuracy of the foregoing interest calculations is without prejudice to any appeal it may take on the merits of the case.

The Clerk will enter this Order, providing a correct copy to all counsel of record.

SIGNED in Houston, Texas, on this __3rd__ day of July, 2008.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE